**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

**TRI STATE ADVANCED SURGERY
CENTER, LLC, GLENN A. CROSBY II, M.D.,
F.A.C.S., and MICHAEL HOOD, M.D.,**

    **Plaintiffs,**

    **vs.**
                                     **Civil Action No. 3:14-CV-00143-JM**

**HEALTH CHOICE, LLC,
and CIGNA HEALTHCARE OF TENNESSEE,
INC.,**

    **Defendants.**

---

**MEMORANDUM IN SUPPORT OF HEALTH CHOICE, LLC'S MOTION TO DISMISS
THE COMPLAINT**

---

       Defendant Health Choice, LLC ("Health Choice"), pursuant to Federal Rule of Civil Procedure 12(b)(6), moves this Court to dismiss Plaintiffs' Complaint against it.  In support of its Motion, Health Choice states as follows:

<u>**INTRODUCTION**</u>

       Plaintiffs' Complaint, distilled to its essence, seeks to undermine the managed-care framework under which the majority of health care services in the United States are provided and funded—a framework that furthers the laudable policy goals of allowing the public broader access to health care by lowering the costs of health products and services while increasing the quality of care provided.  *See Improving Health Care:  A Dose of Competition*, July 2004 Report by the Federal Trade Commission and the Department of Justice, Chapter 1, pp. 3-6 (hereinafter "*Improving Health Care*").  The procompetitive effects of managed care—often cited by federal

agencies and the courts—are undeniable.  *See* Health Care Statements, Statement 9.B.2.c, *available at* http://www.ftc.gov/bc/healthcare/industryguide/policy/statement9.htm; *see also Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 332 (2003).  Plaintiffs' Complaint, however, turns a blind eye to these public policy directives, managed care's role in furthering those directives, and the well-settled precedent absolving managed care organizations from antitrust liability under similar circumstances.

When viewed in the context of managed care and its role in modern health care, the failure of Plaintiffs' Complaint to state a viable claim is readily apparent.  Managed care rose to prominence in the mid-1980s through the mid-1990s to address governmental and private sector concerns about the spiraling costs of health care.  *See Improving Health Care*, Chapter 1, pp. 1-3. Managed care organizations "typically use three strategies to control costs and enhance the quality of care:  (i) selective contracting; (ii) direct financial incentives; and (iii) utilization review."  *Id.* at pp. 3-4.  Selective contracting, which creates a restricted network of providers, "intensifies price competition and allows payors to negotiate volume discounts and choose providers based on a range of criteria."  *Id.* at p. 4.  Managed care networks that "engage in selective contracting can also 'deselect' a provider who does not meet their needs and requirements."  *Id.* at  p. 4, n. 16.  This selective contracting and "deselection" of providers who fail to meet network requirements is both the foundation and the undoing of Plaintiffs' Complaint.

## THE CASE AT BAR

Health Choice is a joint venture physician-hospital organization ("PHO") that operates a managed care network by contracting with certain health benefits payors—predominantly commercial insurers, third party administrators of benefit plans, and employers—to allow

covered individuals access to health care providers within the network for volume-discounted rates.  It is jointly owned by MetroCare, Inc., an independent physician association ("IPA"), and Methodist Le Bonheur Healthcare ("Methodist"), a not-for-profit hospital system.  (*See* Compl. ¶ 4).  This IPA-hospital joint venture PHO structure is commonplace in the health care industry. *See, generally, Improving Health Care*, Chapter 2, pp. 8-9; *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp*., 5 F. Supp. 2d 694, 699 (D. Minn. 1998) aff'd, 208 F.3d 655 (8th Cir. 2000) (noting that "[t]oday, models of health care built on cost containment and managed care predominate").  Health Choice, a "messenger model" PHO at the time of the events described in the Complaint, "allows contracting between providers and payors while avoiding price-fixing among competing providers."  *Id.* at p. 14.  This model of operation has been blessed by the Federal Trade Commission as procompetitive and withstanding antitrust scrutiny.  *See* Health Care Statements, Statement 9.C, available at http://www.ftc.gov/bc/healthcare/industryguide/policy/statement9.htm.

Plaintiffs allege that they have been injured because  the defendants conspired to boycott them from Defendant Cigna Health Care of Tennessee's ("Cigna")  provider network because the Physician Plaintiffs (and other physician owners of Tri State) continued to refer patients to an out-of-network facility, even though the physicians' contracts required in-network referrals to maximize cost savings to the payors and the consuming public.  Essentially, Plaintiff Physicians seek the benefit of being part of the managed care network (access to all of Cigna's subscribers as an in-network patient pool) without any of the corresponding obligations designed to contain costs (refraining from referring patients to an out-of-network surgery center in which they apparently own a financial interest (*see* Complaint ¶ 2) and for which they bill the patients and their insurers without the benefit of the significant volume discount that is applied to in-network

providers). The relief sought by Plaintiffs runs afoul of the basic principles of managed care and would, in fact, harm consumers and payors of health care services by needlessly elevating the cost of medical services.  This would  undoubtedly increase Plaintiffs' revenues, but at the expense of cost efficiencies which ultimately benefit the actual consumers of the medical services described in the Complaint.  No federal, Arkansas or Tennessee law countenances that result.

Health Choice's Co-Defendant, Cigna, is a managed care company that insures its own health insurance policies and also administers benefits plans funded by third-party employers. (Compl. ¶ 15.)  Cigna presents its insureds with a network of physicians, ambulatory surgical centers, hospitals, and other medical providers, all of which may be accessed at favorable "in-network" prices.  Cigna has contracted with Health Choice so that Cigna's insureds have access to the Health Choice physicians, ambulatory surgical centers, and hospitals - as well as others who are not affiliated with Health Choice.

Plaintiffs Glenn A. Crosby II, M.D., and Michael Hood, M.D. (the "Physician Plaintiffs") are surgeons who were formerly "in" the Cigna network.  They, with twelve others, are apparently the entrepreneurial "physician-partners" of Plaintiff Tri State Advanced Surgery Center, LLC ("Tri State").  (*See* Compl. ¶¶ 2, 3, 23.)  Plaintiffs allege that Health Choice and Cigna conspired to boycott and refuse to deal with them, in violation of the Sherman Act.  (*See id.* ¶ 27.)  Specifically, Plaintiffs complain that Defendants conspired to exclude Tri State from Cigna's provider network (*see id.* ¶ 28) and to expel the Physician Plaintiffs from Cigna's network.  Physician Plaintiffs admit they referred their surgical patients to their own surgical center, Tri State, and that they refused to comply with their contractual obligation to refer their

4

surgical patients to Cigna's in-network surgical centers.[1]  Notwithstanding this, they now seek a declaratory judgment that both Defendants have violated the Sherman Act, that Health Choice has tortiously interfered with the Plaintiff Physicians' contracts with Cigna and engaged in deceptive trade practices, and that Defendants have intentionally interfered with Plaintiffs' business expectancies.  They also seek treble damages, punitive damages, and interest.

The substantive relief sought by Plaintiffs - a ruling that the managed care system here violates federal antitrust law and state tort and consumer protection laws - runs afoul of the basic principles of managed care.  Pragmatically speaking, Plaintiffs seek the benefit of belonging to Cigna's managed care network[2] without any of the corresponding obligations designed to contain costs and maintain quality[3].  A ruling to this effect would *harm* consumers  as well as payors of health care services by raising the cost of medical services and preventing Defendants from monitoring and improving the quality of care provided.  What the Plaintiffs seek is a  result that is the *opposite* of what antitrust and consumer protection laws are intended to accomplish.

## STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  For the purposes of a motion to dismiss, the court must presume all factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *See Whitmore v. Harrington*, 204 F.3d 784, 784 (8th Cir. 2000).  A court may consider exhibits attached to a complaint, materials that are necessarily embraced by a complaint, and materials that are part of the public record without converting a motion to dismiss into one for summary judgment.  *Mattes v. ABC*

---

[1] This is a material requirement of the contracts, as it is intended to maximize cost savings to the payors and the consuming public and to allow Cigna to monitor and maximize the quality of services offered to its insureds.
[2] That is, they desire access to Cigna's thousands of subscribers.
[3] Plaintiff Physicians would have the obligation  to refrain from referring patients to an out-of-network surgery center in which they own a financial interest.  For Tri State, that obligation is to join the Cigna network and charge patients accordingly, rather than an amount that is much higher than what "in-network" facilities charge.

*Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003); 5A Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 1006 (2d ed. 1990).

To survive dismissal, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In other words, "[t]he plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

Plaintiffs allege four causes of action against Health Choice: violation of section 1 of the Sherman Act, tortious interference with contract, tortious interference with business expectancy, and violation of the Tennessee Consumer Protection Act. Plaintiffs have failed to satisfy the legal requirements for pleading a viable cause of action against Health Choice under any of these theories of recovery.

## I.     The Complaint Fails to State a Claim under the Sherman Act.

The Sherman Act makes it unlawful to contract or form a conspiracy "in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To plead a violation of section 1 of the Sherman Act, a plaintiff must allege an illegal contract, combination, or conspiracy which results in an unreasonable restraint of trade. Of course, "simply because Plaintiff[s] allege[] an unlawful

restraint of trade in [the] Complaint does not mean that the Court is bound to accept this legal conclusion as true, even on a motion to dismiss." *Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-CV-02031, 2012 WL 511485, at *5 (W.D. Ark. Feb. 15, 2012). Instead, Plaintiffs must plead sufficient facts to make their legal allegations plausible, including facts demonstrating the existence of an antitrust injury and a relevant product market. Here, Plaintiffs have done neither, requiring dismissal of the Complaint.

### A. Plaintiffs Cannot Demonstrate Antitrust Injury.

"It is axiomatic that the antitrust laws were passed for the protection of competition, not competitors." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 344 (8th Cir. 1995). Accordingly, actions that increase competition are not illegal under the antitrust laws, even if, by increasing competition, they adversely impact the plaintiff. "Inflicting painful losses on competitors 'is of no moment to the antitrust laws if competition is not injured.'" *Id.* (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993)). Plaintiffs' Complaint fails to state a claim as a matter of law because the only harm that is alleged (and the only harm that could possibly flow from the facts alleged) is harm to Plaintiffs themselves, not to competition.

The thrust of Plaintiffs' Complaint is that Health Choice agreed with Cigna to enforce the terms of various agreements between and among Cigna, Health Choice, and the Plaintiff Physicians. (*See* Compl. ¶¶ 38, 40-49.) After Plaintiffs refused to abide by those terms, Health Choice allegedly acquiesced in Cigna's decision to terminate the Physician Plaintiffs from Cigna's provider network. (*See* Compl. ¶¶ 7, 41, 48-49.) The problem with these allegations is that selective contracting within a managed health care network—the activity at the heart of the Complaint—is widely recognized as *increasing* competition, efficiency, and quality of care.

Accordingly, the type of harm alleged by Plaintiffs is not anticompetitive conduct that can satisfy the "antitrust injury" requirement under U.S. antitrust law.

"[A]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pacific Bell Tel. Co. v. Linkline Communic'ns, Inc.*, 555 U.S. 438, 448 (2009); *Virginia Acad. of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476, 483 (4th Cir. 1980) ("It has long been recognized that a business may unilaterally choose those with which it will conduct business."). In particular, selective contracting with providers for inclusion in health care insurer networks benefits consumers, because it permits insurers to "control the quality and cost of health-care delivery." *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 332 (2003); *see also Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 660 (8th Cir. 2000) (noting that three hospitals had entered into exclusive dealing arrangements with particular anesthesiologists so that "services would be delivered more efficiently and cost effectively," and dismissing excluded plaintiffs' antitrust claims).

In fact, the Department of Justice and the Federal Trade Commission have expressly recognized the procompetitive benefits of provider networks that exclude particular providers, stating: "[S]uch selective contracting may be a method through which networks limit their provider panels in an effort to achieve quality and cost-containment goals, and thus enhance their ability to compete against other networks." *See* Health Care Statements, Statement 9.B.2.c, available at http://www.ftc.gov/bc/healthcare/industryguide/policy/statement9.htm. Selective contracting provides the additional procompetitive benefits of creating "a favorable market reputation based on careful selection of high quality, cost-effective providers" and "giving non-

participant providers an incentive to form competing networks." *Id.* Accordingly, "most multiprovider networks will contract with some, but not all, providers in an area." *Id.*

Plaintiffs' potential loss of revenue resulting from their refusal to abide by Cigna's network terms is not the type of conduct that antitrust laws are meant to address. Not surprisingly, courts have repeatedly dismissed antitrust claims asserting similar types of individualized harm. *See Four Corners Nephrology Associates, P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1222, 1225-26 (10th Cir. 2009) (holding that a hospital's refusal to share its facilities with a rival nephrologist did not constitute anticompetitive conduct sufficient to sustain an antitrust claim); *Levine v. Central Florida Med. Affiliates, Inc.*, 72 F.3d 1538, 1550 (11th Cir. 1996) (holding that the exclusion of a doctor from a preferred provider organization, and the alleged discouragement of panel members from referring patients to physicians outside the network, did not give rise to an antitrust injury); *Lie v. St. Joseph Hosp.*, 964 F.2d 567, 569–70 (6th Cir. 1992) (holding that, while the suspension of a doctor's staff privileges reduced the doctor's income, it did not have an actual detrimental effect on competition); *Tarabishi v. McAlester Regional Hosp.*, 951 F.2d 1558, 1569 n. 15 (10th Cir. 1991) (holding that plaintiff's staff privileges suspension was not an actual detrimental effect on competition because it did not result in restriction of choice to consumers or in a reduction of competition).

Like the physicians in *Four Corners*, *Levine*, *Lie*, and *Tarabishi*, Plaintiffs here complain that they are losing potential income. (*See, e.g.*, Compl. ¶¶ 12, 78 (complaining of "lost patient referrals," "lost revenues," and "decreased utilization"). That loss is not cognizable under any theory. As noted in *Levine*, our antitrust laws are not designed to "improve [a plaintiff's] income standings in the physician league or help him win the Super Bowl of remuneration." 72 F.3d at 1551. Plaintiffs' only attempt to allege actual harm to competition is the assertion that

approximately thirty patients expressed "shock and frustration" over Plaintiffs' departure from Cigna's network.  (Compl. ¶ 51.)  But Plaintiffs do not allege these patients were actually denied medical services from Plaintiffs, or that the patients were without adequate alternatives in the marketplace.  Plaintiffs have not alleged that Health Choice's actions caused a decline in the quality of outpatient surgical services for patients, or an increase in price.  Without such allegations, Plaintiffs cannot demonstrate a plausible claim to relief under the Sherman Act.

### B.      Plaintiffs Have Failed to Plead a Valid, Relevant Market.

Even if Plaintiffs had alleged a proper antitrust injury, Plaintiffs' claim would still fail as a matter of law.  The Complaint does not allege any per se violation of the antitrust laws, such as a horizontal agreement between competitors, price-fixing, or the division of markets.  *See Double D Spotting Service, Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir.1998).  Instead, Plaintiffs have alleged a refusal to deal between two entities - Health Choice and Cigna - at different market levels.  Because such vertical refusals to deal have recognized procompetitive benefits, Plaintiffs' allegations must be analyzed under the "deferential" rule of reason.  *White v. NFL*, --- F.3d ----, 199 L.R.R.M. (BNA) 3802, 2014-1 Trade Cases P 78,820, 2014 WL 2782203, at *1 (8th Cir. June 20, 2014).  *Accord NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998); *Levine*, 72 F.3d at 1550; *Verma v. Jefferson Hosp. Ass'n*, No. 5:06CV00043-WRW, 2007 WL 4468689, at *6–7 (E.D. Ark. Dec.17, 2007).  Plaintiffs' Complaint falls short of stating a viable claim under this standard.

Under the rule of reason, a court analyzes whether the defendant's conduct had detrimental effects on competition and weighs those effects against the procompetitive benefits of the restraint.  *See Double D*, 136 F.3d at 560.  The plaintiff has the burden of defining both the relevant product market, which includes "all reasonably interchangeable products," and the relevant geographic market, which consists of the "area in which consumers can practically seek

alternative sources of the product." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007) (quoting *Double D*, 136 F.3d at 560).  A plaintiff must also plead that the restraint has "detrimental effects" upon the competitiveness of the market.  *Id.* (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986)).  Here, Plaintiffs have failed to plead a relevant market or detrimental effects on competition.

### 1.      Plaintiffs Cannot Plead a Relevant Product Market.

Defining the limits of a relevant product market requires identifying the choices available to market participants.  *See Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 613 (8th Cir. 2011). Because Plaintiffs are sellers of healthcare services who have allegedly been shut out of the marketplace, the relevant inquiry should focus on Plaintiffs' access to potential purchasers of medical services.  *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009) ("In this case—an exclusive-dealing case involving shut-out cardiologists—the relevant inquiry is whether there are alternative patients available to the cardiologists.").

Plaintiffs purport to define the relevant market in this case as "the market for surgical services or procedures which do not require hospitalization, including orthopaedic surgery, sports medicine, spinal surgery, otolaryngology, and interventional pain management."  (Compl. ¶ 29.)  Elsewhere in the Complaint, however, Plaintiffs make clear that they are only referring to a specific subset of purchasers—namely, private insurance purchasers.  (*See id.* ¶ 6 ("Cigna has a 42 percent market share for commercial insurance products") (emphasis added), ¶ 16 (discussing HMO, PPO, and POS plans), ¶ 29, ¶ 76.)  Plaintiffs' Complaint makes no mention of other potential purchasers of Plaintiffs' services, including Medicaid, Medicare, and uninsured individuals.

Plaintiffs' failure to address the entire spectrum of potential purchasers of outpatient surgical services renders their market definition fatally deficient.  "When there are numerous

sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share." *Little Rock Cardiology*, 591 F.3d at 597 (quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008)). That is exactly what Plaintiffs have tried to do.

*Little Rock Cardiology* is directly on point.   In that case, a cardiology clinic and physicians who practiced at the clinic brought an antitrust action against a hospital operator and a mutual insurance company.   The plaintiffs alleged that the defendants acted in concert to terminate the plaintiffs from the insurer's provider network.  *See id.* at 594.  They defined the relevant market as "the market for cardiology procedures obtained in hospitals by patients covered by private insurance."  *Id.* at 596.  The district court dismissed the complaint, finding that market definition deficient as a matter of law.  The Eighth Circuit Court of Appeals agreed, holding that the plaintiffs were required to "look to alternative patients who are able to pay the required fees, not just those who pay using private insurance."  *Id.* at 597.  "[I]n an antitrust claim brought by a seller, a product market cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller."  *Id.* at 598. Accordingly, because the plaintiffs had improperly tried to limit the relevant market, the appellate court affirmed the dismissal of the complaint.  *See also Marion Healthcare LLC v. Southern Ill. Healthcare*, No. 12–CV–00871–DRH–PMF, 2013 WL 4510168, at *10-11 (S.D. Ill. Aug. 26, 2013) (dismissing antitrust complaint because plaintiffs "failed to include in the relevant markets all potential buyers," including Medicare and Medicaid patients).

Like the doctors in *Little Rock Cardiology* and *Marion Healthcare*, Plaintiffs in this case have "made no allegation that private insurance is the only method of payment [they] can accept." *Little Rock Cardiology*, 591 F.3d at 597.  Instead, Plaintiffs have completely avoided

any mention of the non-private insurance market in the Complaint.  Plaintiffs' silence on this issue renders their proposed market wholly speculative.  "Without a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition."  *See Missouri Hosp.*, 642 F.3d at 613.  Plaintiffs' failure to define a plausible relevant market requires dismissal of the first count of their Complaint.

### 2. Plaintiffs Cannot Plead a Proper Geographic Market.

Plaintiffs have also failed to meet their burden of pleading a proper geographic market. As explained in *Little Rock Cardiology*,

> a geographic market is a geographic area "in which the seller operates, and to which . . . purchaser[s] can practicably turn for supplies."  Broken down, the test requires a court to first determine whether a plaintiff has alleged a geographic market that includes the area in which a defendant supplier draws a sufficiently large percentage of its business—"the market area in which the seller operates," its trade area.  A court must then determine whether a plaintiff has alleged a geographic market in which only a small percentage of purchasers have alternative suppliers to whom they could practicably turn in the event that a defendant supplier's anticompetitive actions result in a price increase. The end goal in this analysis is to delineate a geographic area where, in the medical setting, "'few' patients leave . . . and 'few' patients enter."

*Little Rock Cardiology*, 591 F.3d at 598 (citations omitted);  *see also Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1249 (11th Cir. 2002) ("The law is clear . . . that a geographic market cannot be drawn simply to coincide with the market area of a specific company.").    "[C]ourts have not hesitated to dismiss antitrust claims where it is clear that the alleged geographic market is too narrow or implausible."  *Acre v. Spindletop Oil & Gas Co.*, No. 4:09CV00421 JLH, 2009 WL 4016116, at *7 (E.D. Ark. Nov. 18, 2009).

Here, Plaintiffs define the relevant geographic market as "the Memphis metropolitan statistical area," which includes "the Memphis, Tennessee metropolitan area, including adjacent counties in Mississippi and Arkansas."  (*See* Compl. ¶¶ 6, 31, 75.)  As an initial matter, Plaintiffs' geographic market description (*id.* ¶ 31) is deficient as a matter of law because it fails

to define the "adjacent counties" abutting the alleged market.  *See Acre*, 2009 WL 4016116 at *8 (dismissing antitrust complaint that alleged that "Arkansas and unspecified surrounding states" were the geographical market).    Furthermore, Plaintiffs have not alleged why the relevant geographic market should be limited to the Memphis metropolitan area, regardless of the particular adjacent counties.  The Complaint, in fact, contains several allegations that suggest a broader geographic market. For example, Plaintiffs allege that they treat patients from Arkansas, Mississippi, and Tennessee, but they do not state the percentage of such patients who reside outside of the Memphis metropolitan area.  (*See* Compl. ¶ 12.  *Cf. id.* ¶ 46 (alleging that Tri State offers unique benefits to Arkansas patients)).  Similarly, Plaintiffs allege that Methodist operates eight hospitals in "west Tennessee and Mississippi" and none in Arkansas, but they do not allege the extent to which these facilities treat the same patient pool as Tri State.  (*See id.* ¶ 18.)  In sum, Plaintiffs do not include any factual allegations making it plausible that their proposed geographic market is one in which "few patients leave . . . and few patients enter."  *Little Rock Cardiology*, 591 F.3d at 598 (quotation marks omitted).  Because Plaintiffs' proposed geographic market is inherently suspect and improperly speculative,  the court "cannot find that [they have] stated a plausible antitrust claim."  *Id.* at 599.

### 3.  Plaintiffs Cannot Plead Detrimental Effects on Competition.

Even if Plaintiffs could identify a relevant product and geographic market for purposes of an antitrust claim,  their claim would fail because Plaintiffs cannot and do not plead detrimental effects on competition.

> A plaintiff may satisfy the "detrimental effects" element of its burden in one of two ways.  First, a plaintiff may put forth evidence of "actual, sustained adverse effects on competition" in the relevant market.  If the plaintiff cannot submit such evidence, it is relegated to the more challenging course of proving detrimental effects on competition by making "an inquiry into market power and market structure designed to assess the [restraint]'s actual effect."  A defendant or cartel of defendants has market power if it has the ability "to raise price above the

competitive level without losing so many sales so rapidly that the price increase is unprofitable and must be rescinded."

*Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007) (citations omitted).  Plaintiffs have failed to plead either market power or actual detrimental effects.

First, Plaintiffs do not even attempt to allege that Health Choice exerts market power. Plaintiffs cannot make such an allegation because Health Choice is a joint venture that contracts and coordinates on behalf of physicians and non-physician medical providers that comprise its network; Health Choice is not a provider of surgical services, like Plaintiffs.  *See Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1140 (E.D. Ark. 2008) (holding that plaintiffs failed to establish market power as a matter of law because none of the defendants competed with the plaintiff in the relevant market).  Presumably for this reason Plaintiffs attempt to plead market power by alleging that a non-party (Methodist) exerts power through its supposed agent, Health Choice.  Plaintiffs cannot, however, impute Methodist's supposed market power to Health Choice merely by alleging the two entities are affiliated.  *See, e.g.*, *Minebea Co., Ltd. v. Papst*, 444 F. Supp. 2d 68, 216 (D.D.C. 2006) (rejecting the notion that the holder of a patent can vicariously accrue market power from the patent's licensees); *Monsanto Co. v. Scruggs*, 342 F. Supp. 2d 568, 583 (N.D. Miss. 2004) (rejecting the "remarkable position" that "the market shares of Monsanto's seed partners" could be used "in determining Monsanto's share of the relevant market").

Moreover, even if Plaintiffs could permissibly establish Health Choice's market power vicariously, the allegations in the Complaint fail to state a plausible basis for such power. Plaintiffs claim that Methodist is the dominant hospital operator in Memphis, with an alleged 40% market share.  (*See* Compl. ¶¶ 16-18, 30.)  Plaintiffs' proposed product market, however, is not the entire hospital market.  Rather, it is "the market for surgical services or procedures which

do not require hospitalization." (*Id.* ¶ 29.)  Plaintiffs do not allege what percentage of the outpatient surgical services market Methodist occupies.  Without such allegations, Plaintiffs' assertion of market power is speculative.

In addition, Plaintiffs have failed to allege actual detrimental effects on competition. Actual detrimental effects on competition include increased prices, reduced output, or decreased quality. *See Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 662 (8th Cir. 2000) (holding that nurse anesthetist plaintiffs had failed to demonstrate increased prices for anesthesia services, or a decline in either the quality or quantity of such services available to surgery patients, requiring plaintiffs to prove market power).  As discussed above, the Complaint does not allege any of these harmful consumer outcomes.  To the contrary, Defendants' alleged enforcement of the terms of Cigna's provider network may be presumed to have substantial procompetitive effects. *See infra* at 1-4.

Even if Plaintiffs' potential loss of income could qualify as a detriment to competition (and it cannot), Plaintiffs have not alleged that Health Choice's so-called "attempt to drive Tri State out of business" has been successful.  (Compl. ¶ 27.)  For example, Plaintiffs do not allege that they are unable to compete for Medicare and Medicaid patients and for non-insured individuals.   Plaintiffs do not allege they have been terminated from any of the provider networks run by insurers other than Cigna, such as Aetna and Blue Cross.  (*See id.* ¶¶ 60-62.) According to Plaintiffs' Complaint, these other insurers constitute nearly 60% of the commercial health insurance market in the Memphis metropolitan statistical area.   (*See id.* ¶ 6.) "[R]estricting the number of health care providers affiliated with a [managed health care plan] can simultaneously reduce competition among them and *stimulate competition* between health service networks." *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.*, 123 F.3d

301, 308 (5th Cir. 1997) (dismissing claim for concerted refusal to deal against hospital and PPO because plaintiff failed to show that affiliation with the PPO was necessary to compete in the market).  Here, Plaintiffs' failure to allege an inability to compete in the remaining segments of the market renders their allegation of detrimental effects implausible.  *See Gold v. Methodist Healthcare Memphis Hosp.*, No. 06–2329, 2008 WL 6875019, at *6 (W.D. Tenn. Jan. 15, 2008) (finding no decrease in "competition for radiological services in the Memphis market" where defendants "control[led] only forty percent of that market" and plaintiffs did not allege that defendants' actions excluded them from "the remaining sixty percent" of the market). Accordingly, Plaintiffs' first cause of action should be dismissed.

## II.    The Complaint Fails to State a Claim for Tortious Interference with Contract or Business Expectancy.

Plaintiffs' second and third counts against Health Choice allege tortious interference with contract (on behalf of the Physician Plaintiffs) and tortious interference with business expectancy (on behalf of all Plaintiffs).[4]  Like Plaintiffs' antitrust claim, these counts should be dismissed for failure to state a claim as a matter of law.

To state a claim for tortious interference with a business or contractual expectancy, a plaintiff must allege facts sufficient to prove: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.  *El Paso Production Co. v. Blanchard*, 269 S.W.3d 362, 373 (Ark. 2007).  In addition, the interference must be improper to be actionable. *Id.* (citing *Stewart*

---

[4] Plaintiffs do not state whether they seek to bring these claims under Arkansas or Tennessee law.  As discussed below, the elements of a claim for tortious interference are substantially the same under Arkansas and Tennessee law.  Accordingly, Plaintiffs have failed to state a claim under either state's law.

*Title Guaranty Co. v. American Abstract & Title Co.*, 215 S.W.3d 596 (Ark. 2005)); *see also Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 700-01 (Tenn. 2002) (stating similar elements under Tennessee law).

"It is well settled that a party to a contract, and its agents acting in the scope of their authority, cannot be held liable for interfering with the party's own contract." *Sutton v. Arkansas State Univ.*, No. 3:11CV00123 JLH, 2011 WL 3861391, at *4 (E.D. Ark. Sept. 1, 2011) (quoting *St. Joseph's Reg'l Health Ctr. v. Munos*, 934 S.W.2d 192, 196 (Ark. 1996)); *see also Faulkner v. Arkansas Children's Hosp.*, 69 S.W.3d 393, 405 (Ark. 2002); *Nashville Marketplace Co. v. First Capital Institutional Real Estate, Ltd.-2*, No. 89-144-II, 1990 WL 33373, at *9 (Tenn. Ct. App. Mar. 28, 1990) ("A party cannot tortiously induce the breach of its own contract."). Here, the Complaint alleges that Health Choice had contractual relationships with each of the groups related to Plaintiffs' two tortious interference claims. Thus, those claims fail as a matter of law.

First, Plaintiffs' interference with contract claim is based on the Physician Plaintiffs' purported "indirect contracts with Cigna." (Compl. ¶ 82.) As the Complaint explains, however, these so-called "indirect contracts with Cigna" are contracts (a) between the Physician Plaintiffs and MetroCare, a member of Health Choice, and (b) between Cigna and Health Choice. (*See id.* ¶¶ 4-5, 82, 37-38 (alleging that the Physician Plaintiffs participated in Cigna's provider network "through Health Choice")). Health Choice's allegedly tortious conduct is, in fact, activity taken in regard to its own contractual relationships. Plaintiffs' second cause of action therefore fails as a matter of law. *Sutton*, 2011 WL 3861391, at *4; *Faulkner*, 69 S.W.3d at 405.

Plaintiffs' claim for tortious interference with business expectancy fares no better. In support of this claim, Plaintiffs allege that Health Choice interfered with Plaintiffs' "future relationships with many patients with Cigna insurance in the Memphis metropolitan area."

(Compl. ¶ 88.)  Plaintiffs' focus on potential future relationships with Cigna subscribers misses the mark.  The conduct of which Plaintiffs complain, such as discouraging Cigna network providers from referring patients to Tri State, allegedly occurred pursuant to agreements to which Health Choice is a party.  (*See, e.g., id.* ¶ 15 (alleging that Cigna has "contracted with Health Choice so that Cigna's members may access the provider network created by Health Choice"); ¶ 17 (alleging that all physicians "must participate with Cigna through Health Choice")).  As with Plaintiffs' contract-based claim, these actions taken "pursuant to already existing relationships" cannot, as a matter of law, support a claim for tortious interference.  *See, e.g., Marion Healthcare*, No. 12-CV-00871-DRH-PMF, 2013 WL 4510168, at *14-*15 (dismissing claim of tortious interference as a matter of law where plaintiff-physician alleged that defendant had threatened to terminate its network physicians if they permitted a patient with out-of-network benefits to use the plaintiff's out-of-network surgical center).

Plaintiffs' claim for tortious interference also fails as a matter of law because Plaintiffs have failed to allege that Health Choice acted improperly.  Plaintiffs' assertion of improper conduct rests on the same allegations supporting their Sherman Act claim.  (Compl. ¶ 90.)  As discussed throughout this brief, those allegations fail as a matter of law to state an antitrust claim. Accordingly, they cannot support a claim for tortious interference.  *Acre*, No. 4:09CV00421 JLH, 2009 WL 4016116, at *4 (dismissing claim for tortious interference because the allegedly "improper" conduct was simply the "routine and customary practice in the oil and gas industry"); *Seaton v. TripAdvisor, LLC*, No. 3:11-CV-549, 2012 WL 3637394 (E.D. Tenn. Aug. 22, 2012) (dismissing complaint that relied solely on an insufficiently-pled defamation claim to support element of "improper means" under Tennessee law, and denying as futile plaintiff's request for leave to amend).

III.    **The Complaint Fails to State a Claim for Violation of the Tennessee Consumer Protection Act.**

Plaintiffs' fourth cause of action purports to assert a claim under the Tennessee Consumer Protection Act ("TCPA").  "A plaintiff stating a claim under the TCPA must show: '(1) that the defendant engaged in an unfair or deceptive act or practice' and (2) that the plaintiff suffered 'an ascertainable loss of money or property' as a result."  *Pagliara v. Johnston Barton Proctor & Rose, LLP*, 708 F.3d 813, 819 (6th Cir. 2013) (quoting *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005)).  Because a claim under the TCPA sounds in fraud, the circumstances constituting the claim must be stated with particularity.  *Humphries v. West End Terrace, Inc.*, 795 S.W.2d 128, 132 (Tenn. Ct. App. 1990).

A.    **Plaintiffs' Claim is Barred by the Statute of Limitation.**

The TCPA contains a one-year statute of limitations.  Tenn. Code Ann. § 47-18-110.  Plaintiffs' Complaint was filed on June 5, 2014.  (*See* Compl.)  In the Complaint, Plaintiffs allege that "based on an agreement that Health Choice reached with Aetna, on January 25, 2013, Aetna sent letters to several Tri State physician-investors" reminding the physician investors of their obligations to refer patients to participating network providers.  (*Id.* ¶ 60.)  The Complaint further alleges that, because Tri State had not yet opened, it was "apparent" from the face of the letters "that Aetna had been directed to send" them by Health Choice.  (*Id.*)  This fact was "apparent because an internal review would have shown no claims submitted for medical services performed at Tri State."  (*Id.*)

Given that Health Choice's alleged attempts to quash referrals to Tri State is the basis for Plaintiffs' TCPA claim, Plaintiffs' own pleadings demonstrate they were aware of sufficient facts to put them on notice of their alleged claim more than one year before they filed this lawsuit.  (*See id.* ¶¶ 60, 68-73.)  Consequently, Plaintiffs' fourth cause of action is untimely and

thus due to be dismissed.  *Schmank v. Sonic Auto., Inc.*, No. E200701857COAR3CV, 2008 WL 2078076, at *5 (Tenn. Ct. App. May 16, 2008) (affirming dismissal of TCPA claim on motion to dismiss because complaint established as a matter of law that claim was untimely); *Lambdin v. Aerotek Commercial Staffing*, 3:10-CV-280, 2011 WL 3794040, at *7 (E.D. Tenn. Aug. 25, 2011) (dismissing TCPA claim as untimely based on allegations in the complaint, and, because plaintiff's own admissions established untimeliness, denying leave to amend with respect to that claim).

### B.    Plaintiffs Have Failed to State a TCPA Claim.

Plaintiffs' TCPA claim is also deficient as a matter of law because the challenged conduct is authorized by federal law.  The TCPA does not apply to "[a]cts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of this state or of the United States."  Tenn. Code Ann. § 47–18–111(a)(1).  Here, Plaintiffs complain of Health Choice's alleged acquiescence in Cigna's decision to terminate Plaintiffs from Cigna's provider network because Plaintiffs refused to abide by the network's terms.  The PHO managed care network at issue here is specifically authorized by federal law.  *See* Health Care Statements, § 9.C.,  available  at   http://www.ftc.gov/bc/healthcare/industryguide/policy/statement9.htm. Health Choice's alleged actions in furtherance of the network's viability cannot support a claim under the TCPA.  *See MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 732 (6th Cir. 2007) (affirming dismissal of TCPA claim where conduct at issue was authorized by federal Electronic Signatures in Global and National Commerce Act).

Finally, Plaintiffs' allegations fail because Health Choice's alleged conduct is not deceptive as a matter of law.  According to Plaintiffs, Health Choice advertised itself as protecting "physicians and their practices" and working "for our providers as a <u>unified voice</u>."

(Compl. ¶¶ 68-69 (emphasis added).)  The Complaint does not allege that Health Choice acted against the interests of the unified MetroCare membership.  Instead, the Complaint alleges that Health Choice acted against Plaintiffs' unique interests.  Plaintiffs do not point to any representation from Health Choice that it would advocate on behalf of any individual physician's interest at all - let alone to any representation it would do so if that interest were counter to those of Health Choice's other members.  By complying with the terms of Health Choice's agreement with Cigna - an agreement made for the benefit of all Health Choice members - Health Choice was complying with its promise to work for its "providers as a unified voice."  (*Id.* ¶ 69.) Plaintiffs' desire to exploit Cigna's managed care network without sharing in its responsibilities and restrictions cannot support a claim against Health Choice under the TCPA.

## <u>CONCLUSION</u>

The inadequacy of Plaintiffs' Complaint "results not from inadequate draftsmanship or the absence of discovery but from an incurable defect in the legal theory."  *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1132 (E.D. Ark. 2008). Because the deficiencies identified above cannot be cured by further amendment, Health Choice respectfully requests that the Court dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.

/s/ Leigh M. Chiles
Leo Bearman Jr. (TN # 8363)
Leigh M. Chiles (AR # 98223, TN # 25809)
Matthew S. Mulqueen (TN # 28418)

165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
lbearman@bakerdonelson.com
lchiles@bakerdonelson.com
mmulqueen@bakerdonelson.com
901-526-2000 (telephone)
901-577-2303 (facsimile)

Lea Carol Owen (TN # 19531)
211 Commerce Street, Suite 800
Nashville, Tennessee 37201
615-726-5600 (telephone)
615-744-5610 (facsimile)
cowen@bakerdonelson.com

*Attorneys for Defendant Health Choice, LLC*

## <u>CERTIFICATE OF SERVICE</u>

      I certify that on this 29th day of August, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to all counsel of record.


                /s/ Leigh M. Chiles_____
                Leigh M. Chiles