IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

TRI STATE ADVANCED SURGERY
CENTER, LLC, GLENN A. CROSBY II, M.D.,
F.A.C.S., and MICHAEL HOOD, M.D.

PLAINTIFFS

v.                                                          Case No. 3:14-CV-00143-JM

HEALTH CHOICE, LLC,
and CIGNA HEALTHCARE OF TENNESSEE, INC.

DEFENDANTS

**REPLY IN SUPPORT OF CIGNA HEALTHCARE OF
TENNESSEE, INC.'S MOTION TO DISMISS COUNTS I AND III**

## **INTRODUCTION**

Nothing in Plaintiffs' Opposition[1] transforms Cigna's lawful right to enforce its provider contracts with Physician Plaintiffs into a treble-damages antitrust violation, and Plaintiffs' Sherman Act claim fails for multiple reasons. At the outset, Plaintiffs have failed to plausibly allege an agreement in restraint of trade. Plaintiffs do not contest Cigna's contractual right to terminate contracts with network providers like Dr. Crosby and Dr. Hood who refer patients to out-of-network providers, nor do they challenge Cigna's legitimate interest in doing so, including its well-established right to protect its provider network. At most, Plaintiffs allege that Cigna acted in response to Health Choice's complaints, but the case law makes clear that this is not enough to plausibly suggest a Section 1 agreement—particularly since Physicians Plaintiffs' breaches of their contracts with Cigna provide a ready and legitimate explanation for their termination. Plaintiffs also have no answer to the fact that it makes no economic sense for Cigna to enter into a conspiracy that would allow Methodist to seek supracompetitive prices and demand more favorable contract terms, and that courts regularly dismiss alleged conspiracies based on such implausible economic theories.

But even if Plaintiffs pled a conspiratorial agreement—and they have not—Plaintiffs have not pled a prohibited restraint of trade. The Complaint's limited allegations about Cigna's conduct do not plausibly show that Tri State risked exclusion from the market, because it could still get referrals from the same physicians as out-of-network providers and have access to a broad array of patients outside of Cigna's plans. And the Complaint does not allege that members of Cigna-administered plans could not still see Tri State on their own, or that Cigna

---

[1] Cigna's Reply uses the following abbreviations: (1) "Mem." to refer to the Memorandum in Support of Cigna Healthcare of Tennessee, Inc.'s Motion to Dismiss Counts I and III (Dkt. 46); and (2) "Opp." or "Opposition" to refer to Plaintiffs' Opposition to Defendant Health Choice, LLC's Motion to Dismiss Plaintiffs' Complaint and Cigna Healthcare of Tennessee, Inc.'s Motion to Dismiss Counts I and III of Plaintiffs' Complaint (Dkt. 60).

would not honor their out-of-network benefits if they did so. In other words, Tri State is now in no different position than any other provider operating outside of Cigna's network.

Plaintiffs' Opposition shows why their antitrust claim fails for yet another, independent reason: Plaintiffs have not pled neither a *per se* nor a rule-of-reason violation, nor an antitrust injury. Health Choice, Methodist, and Cigna are not defendants that compete at the same market levels as each other, foreclosing application of the *per se* rule. And Plaintiffs' allegations about Cigna's and Methodist's market shares in commercial insurance and hospital services, respectively, are insufficient to show that either one had power in the relevant market for outpatient surgeries. Plaintiffs also do not allege that Cigna's actions had any actual detrimental effect on competition, as Plaintiffs admit that Cigna is just one of many payors (both public and private) for outpatient surgical services, which ensures that Cigna's alleged actions will not affect competition. For the same reason, Plaintiffs have failed to allege that they have suffered an antitrust injury, and their allegations that Tri State's departure from the market would reduce quality, consumer choice, and "bargained-for benefits" are too conclusory to fill this void.

The Opposition fares no better in trying to save Plaintiffs' tag-along claim for tortious interference. Plaintiffs admit that Cigna has contractual relationships with its patients and network providers, and Plaintiffs' suggestion that they can state a claim for tortious interference based on actions that Cigna took pursuant to these already existing relationships has no support in Arkansas law and has been expressly rejected by courts outside the state. Moreover, because Plaintiffs have failed to allege an antitrust violation, they cannot piggyback off those insufficient allegations to show Cigna acted improperly under Arkansas law.

## ARGUMENT

I.    **Plaintiffs Have Failed to State a Sherman Act § 1 Claim (Count I) Against Cigna.**

    A.    **Plaintiffs Have Failed to Allege a Plausible Unlawful Agreement.**

Nothing in Plaintiffs' Opposition transforms Cigna's legitimate enforcement of its provider agreements into an antitrust violation. Plaintiffs admit, as they must, that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell. Tel. v. LinklineCommc'ns,* 555 U.S. 438, 448 (2009). Plaintiffs also unsurprisingly concede, as their Complaint alleges and Physician Plaintiffs' contracts show, that: (1) Cigna allows medical providers that it finds acceptable to join Cigna's network; (2) to stay in Cigna's network, they must abide by certain rules, including a requirement to refer patients to in-network providers; and (3) Physician Plaintiffs refused to abide by these rules, leading to their termination. (Mem. at 8; Compl. ¶¶ 38, 41, 47-48.) And Plaintiffs do not dispute that Cigna has a legitimate interest in enforcing the terms of its provider contracts to protect its provider network. (Mem. at 11-12 (collecting cases).)

Instead, Plaintiffs contend that they need not "disprove all possible lawful explanations" of an unlawful agreement at the pleading stage, and so the Complaint's barebones allegation of a conspiratorial agreement is sufficient. (Opp. at 9.) Plaintiffs misstate the law, which requires them to "allege specific facts 'plausibly suggesting (not merely consistent with) agreement' in restraint of trade." *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 (8th Cir. 2010); *see also Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.*, 2012 WL 511485, at *5 (W.D. Ark. Feb. 15, 2012) ("[S]imply because Plaintiff alleges an unlawful restraint of trade in its Complaint does not mean that the Court is bound to accept this legal conclusion as true, even on a motion to dismiss."). Plaintiffs' Opposition shows that they have not cleared this threshold.

As an initial matter, Plaintiffs have failed to actually plead an agreement to boycott Tri State. Plaintiffs' Opposition suggests that Health Choice complained about Tri State and in-network physician referrals to Tri State, and that Cigna then reacted to Health Choice's complaints. (Opp. at 6.) This is not enough to show an agreement to boycott. A complaint does not allege a Section 1 agreement if the allegations establish "merely parallel conduct that could just as well be independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Nor can an agreement "be inferred merely from the existence of [competitor] complaints, or even from the fact that termination came about 'in response to' complaints." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984).

Applying these principles in *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, 2014 WL 560462 (D. Colo. Feb. 13, 2014)—a case that alleged a similar antitrust conspiracy by healthcare insurers and other defendants to boycott ambulatory surgical centers (ASCs) that, like Tri State, are associated with Counterclaim Defendant SurgCenter Development, and to terminate physicians from the insurers' networks for referring patients to ASCs—the court found that plaintiffs failed to allege an agreement, where:

> The [First Amended Complaint] itself describe[d] the reasons the Insurers gave for terminating or threatening to terminate these physicians from their networks: the physicians were in breach of their network contracts because they were referring patients to out-of-network facilities, namely Plaintiffs' facilities.

*Id.* at *9; *compare with* Compl. ¶¶ 38, 41, 47-48 (admitting that Physician Plaintiffs refused to abide by Cigna's referral requirements, leading to their termination). And while plaintiffs in *Kissing Camels* argued (just as Plaintiffs do here) that these reasons were "pretextual," and that the terminations were actually the result of insurers' "agree[ment] with the hospitals to conspire to put Plaintiffs out of business," the court rejected this argument—concluding that this was "possible" but not "plausible," because the allegations "[did] not suggest that [insurers] made 'a

4

conscious commitment to a common scheme designed to achieve an unlawful objective.'" 2014 WL 560462, at *9 (quoting *Monsanto*, 465 U.S. at 764). That is the case here too.

Plaintiffs' failure to plausibly plead an agreement to boycott is further highlighted by the fact that, as Cigna pointed out, the purported conspiracy between Cigna and Health Choice to eliminate one of Methodist's competitors makes no economic sense. (Mem. at 9-11.) In response, Plaintiffs argue only that Cigna sought "to obtain better terms in its contract with Health Choice and in order to keep Methodist in its provider network." (Opp. at 7 (citing Compl. ¶ 7).) But Plaintiffs do not explain why Cigna would not have Methodist in its network absent this alleged agreement, nor do they explain how this agreement might actually result in better contract terms with Health Choice. In fact, the laws of supply and demand show the opposite is true: with less threat of competition, Methodist would have greater ability to charge supracompetitive rates to Cigna and otherwise obtain more favorable network terms. Courts regularly dismiss alleged conspiracies based on such implausible economic theories. (Mem. at 9-11 (collecting cases).)

Plaintiffs also ask this Court to overlook that the stated rationale for terminating Physician Plaintiffs—Physician Plaintiffs' persistent referrals to out-of-network provider Tri State undermined Cigna's provider network— does actually make economic sense. (Opp. at 8.) Plaintiffs' argument ignores the prevailing view of the law. *See, e.g.*, *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 838 (D.N.J. 2011) ("The problem with Plaintiffs' antitrust claim is that there is nothing anticompetitive about the complained-of scheme of shifting business to network providers."); Mem. at 11-12 (collecting cases); *see also* Ark. Code. Ann. § 29-99-204(a)(3) (allowing insurers to exclude providers if the provider will not "accept the health benefit plan's operating terms and conditions"). Plaintiffs also ignore the facts. Physician

Plaintiffs' contracts with Cigna required them to refer patients to in-network providers, a term included in Dr. Crosby's agreement *fifteen years* before Tri State opened. (Mem. at 4-5; Ex. B (dated August 30, 1996).) Physician Plaintiffs do not suggest that they complied with this requirement. In fact, their own complaint shows that they were terminated as in-network providers only *after* Cigna asked them to abide by the referral rules, but they refused. (Mem. at 8; Compl. ¶¶ 41, 47-48.) Plaintiffs' argument that Cigna's stated rationale for termination was "pretextual" thus fails. *See Kissing Camels*, 2014 WL 560462, at *9 (rejecting similar "pretextual" argument where, among other things, the physicians' "out-of-network referrals breached [their] contracts").

### B. Plaintiffs Fail to Plausibly Allege an Actual Boycott In Restraint of Trade.

In addition to failing to allege an illegal conspiracy, Plaintiffs have also failed to plead a prohibited restraint of trade based on a group boycott because, as Cigna noted in its opening brief, Plaintiffs do not actually allege that Cigna engaged in a boycott of Tri State. (Mem. at 9.) To plead a group boycott, Plaintiffs must allege (among other things) that "firms with market power boycott[ed] suppliers or customers in order to discourage them from doing business with a competitor." *See Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 659 (8th Cir. 2000) (quoting *F.T.C. v. Ind. Fed. of Dentists*, 476 U.S. 447, 458 (1986)). In response to Cigna's motion that they failed to do so, Plaintiffs primarily respond with a slew of allegations that have nothing to do with Cigna. (Opp. at 5-6 (noting allegations that the conspiracy supposedly "originated with Health Choice and Methodist," discussions by Health Choice about Tri State, and Methodist's purported "history . . . of working with health insurers to eliminate competition").) In fact, Plaintiffs' only two allegations that Cigna actually did anything pursuant to an agreement are that Cigna refused to provide Tri State with an in-network contract, and terminated or threatened to terminate the contracts of network providers that referred patients to

6

Tri State. (*Id.* at 6 (citing Compl. ¶¶ 7, 77).) But nowhere in the Complaint are there any allegations that members of Cigna-administered plans could not still see Tri State on their own accord, or that Cigna would not honor their out-of-network benefits if they did. (Mem. at 9.)

The closest Plaintiffs come is arguing in their brief—without corresponding allegations in the Complaint—that terminating network contracts with referring providers effected a boycott because "[p]hysicians perform procedures at Tri State." (Opp. at 7.) But Plaintiffs do not explain how this translates to an effective boycott of Tri State from the market. For instance, Plaintiffs offer no reason why such physicians must be in network with Cigna—and for good reason, because no such requirement exists. Indeed, if providers like Physician Plaintiffs wish to continue to refer patients to Tri State, they are free to do so as out-of-network providers, without the benefits that come with in-network access to Cigna's plan members. Plaintiffs' attempt to distinguish *Minnesota Association of Nurse Anesthetists v. Unity Hosp.* is therefore inapposite. 208 F.3d 655, 659 (8th Cir. 2000) (rejecting claim of unlawful boycott based on agreement that prevented nurses from performing anesthesia services at defendant hospitals where, among other things, "the hospitals . . . continued to . . . use nurse anesthetist services, albeit on different contractual terms").[2]

### C. Plaintiffs Have Failed to Allege Either a *Per Se* or Rule-of-Reason Violation.

#### 1. The *per se* rule is inapplicable as a matter of law.

Even had Plaintiffs properly pled an agreement in restraint of trade (which they have not), their Section 1 claim would fail still because Plaintiffs have not alleged either a *per se* or a

---

[2] Plaintiffs' invocation of *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284 (1985) is equally unavailing. (Opp. at 6-7.) Not only are Plaintiffs wrong that that this case presents a *per se* antitrust violation, as explained below (*see infra* Sec. I.C.1**Error! Reference source not found.**), Plaintiffs have not alleged key elements that would make this case at all applicable, including that Cigna "possesses market power" in the relevant market, or that it has "exclusive access to an element essential to effective competition," or that the alleged boycott "cut[s] off access to a supply, facility, or market necessary . . . to compete." *Id.* at 294, 296.

7

rule-of-reason violation. Plaintiffs do not challenge the Supreme Court "precedent limit[ing] the *per se* rule in the boycott context to cases involving **horizontal agreements** among **direct competitors**." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (emphasis added); *see also* Mem. at 12 (collecting cases). Nor do Plaintiffs argue that a boycott involving Health Choice and Cigna meets this standard because they cannot dispute that Cigna and Health Choice do not compete at the same market level. Instead, Plaintiffs suggest without explanation that their inclusion of Methodist in the conspiracy is enough to satisfy their burden.

Plaintiffs are wrong. Not only is this allegation not in their Complaint (*see* Compl. ¶ 7 (alleging that "Health Choice and Cigna engaged in a concerted refusal to deal or boycott of the Plaintiffs" without mention of non-party Methodist)), but Methodist is not on the same market level as either Cigna or Health Choice. As Plaintiffs allege, Methodist is a healthcare provider, whereas Health Choice services providers like Methodist by contracting on their behalves with managed care companies like Cigna, which in turn administers the healthcare plan benefits of Methodist's patients. (*Id.* ¶¶ 15, 17-18.) The relationships between each of Cigna, Methodist, and Health Choice reflect the arrangements between service providers and their clients—not direct competitors. Accordingly, the *per se* rule does not apply.

Plaintiffs' reliance on *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) is therefore unavailing. (Opp. at 10-11 (also citing *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 774 (8th Cir. 2004) (reversing district court's finding that *per se* rule was applicable)).) *Klor's* involved a horizontal agreement between direct competitors-defendants. *See NYNEX*, 525 U.S. at 136 ("*Klor's* was a case involving not simply a 'vertical' agreement . . . but a case that also involved a 'horizontal' agreement among competitors.").[3]

---

[3] *See also, e.g., Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 734 (1988) (recognizing that *Klor's* "involved horizontal combinations . . . at the manufacturer and wholesaler levels."); *Lomar Wholesale Grocery, Inc. v. Dieter's*

8

Here, Plaintiffs' conspiracy allegation is that "Health Choice and Cigna engaged in a concerted refusal to deal or boycott of the Plaintiffs" (Compl. ¶ 7), but Health Choice and Cigna are ***not*** direct competitors, and Methodist is not either, even if it were a defendant. Accordingly, the *per se* rule does not apply.

### 2. Plaintiffs have not alleged a rule-of-reason violation.

Plaintiffs did not defend their failure to allege either that Cigna has dominant market power in the relevant market or that its alleged conduct had "actual detrimental effects" on competition; thus, Plaintiffs have also failed to state a claim under the rule-of-reason analysis. *See Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993).

**Dominant market power.** According to Plaintiffs, the relevant market here is the market for outpatient surgical services (Compl. ¶ 29), and as Cigna's opening brief showed, Cigna does not participate in this market at all, foreclosing any possibility that it has any market share. (Mem. at 13-14.) Plaintiffs attempt to get around this deficiency by pointing to their allegation that non-party "Methodist possesses a 40% market share in the Memphis metropolitan area and 'has the dominant hospital system.'" (Opp. at 14 (citing Compl. ¶¶ 17, 18, 30).) But as Cigna noted in its opening brief, Plaintiffs' proposed product market is ***not*** the entire hospital market, only a narrow subset of it—outpatient surgical services. (Compl. ¶ 29; *see* Mem. at 14.)

Plaintiffs' only response is that Methodist's "overall market share . . . is probative" of Methodist's power in the outpatient surgical services market. (Opp. at 14.) "Probative" is not enough: a rule-of-reason plaintiff must actually show that the alleged conspirator has a dominant market share in the relevant market. *See Flegel*, 4 F.3d at 682. Plaintiffs cannot meet these

---

*Gourmet Foods, Inc.*, 824 F.2d 582, 590 (8th Cir. 1987) (acknowledging *Klor's* but "hold[ing] that refusals to deal involving no concerted action between horizontal competitors do not constitute *per se* unlawful group boycotts.").

requirements with allegations about market share in a much broader market involving a host of other players.

Plaintiffs' contention that Cigna has sufficient market share in a completely different market, "the combined commercial products markets in the Memphis MSA," does not save their claim. (Opp. at 15.)  Plaintiffs acknowledge that their market definition is "**not** limited to commercial payors" (*id.* at 13 (emphasis in original)), and Cigna's share of the commercial products market does not account for other significant payors in the market for the purchase of outpatient surgical services, like Medicare, Medicaid and patients without insurance.  Plaintiffs' allegation about Cigna's market share therefore falls short of showing that "Cigna has the power to coerce physicians to refer patients to the provider of Cigna's choice," as Plaintiffs insist. (*Id.* at 15.)

**Actual detrimental effects on competition.**  Plaintiffs' Opposition also confirms that they have not alleged "actual detrimental effects" on competition in the relevant market. Physician Plaintiffs allege economic harm to themselves (*id.* at 16), but as addressed below, this is not an injury to competition.  And while Plaintiffs allege that losing access to Cigna's plan members will drive Tri State out of business because of Cigna's share of the private health insurance market (*id.* at 12), Plaintiffs offer no response to the fact that Tri State can also see patients covered by government insurance (like Medicaid or Medicare), as well as patients who have no insurance at all but may still provide Tri State business. (*See* Mem. at 15-16.)  In fact, Plaintiffs assert just the opposite, arguing that the market is "**not** limited to commercial payors." (Opp. at 13 (emphasis in original).)  And although Plaintiffs' brief argues that plan members will be "unable to utilize out-of-network benefits" (*id.* at 12), their Complaint alleges only that

Cigna's plan members cannot get referrals through in-network providers (and thus may be unwilling—but not unable—to see Tri State). (*See* Compl. ¶¶ 7, 28, 66.)

Plaintiffs' contention that Tri State lacked access to other private insurers' members because "Health Choice was conspiring with the other insurers in the Memphis MSA in order to effectuate the boycott of Tri State" (Opp. at 16) is equally misplaced. Plaintiffs do not allege that Cigna knew about any of these other prior alleged conspiracies, let alone agreed to them. (*See id.* (citing Compl. ¶¶ 35, 60-62 (alleging that Methodist and Health Choice had previously conspired with health insurers other than Cigna).) But given that Plaintiffs now argue that an industry-wide boycott was necessary to effectively exclude Tri State from the market, corresponding allegations of industry-wide agreement are necessary to state an antitrust claim. *See, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) (holding that allegations of a "rimless wheel" hub and spoke conspiracy are insufficient).

Moreover, even alleging that Cigna's actions alone pushed Tri State out of the market would not be enough to establish detrimental effects on competition. Rather, to show actual detrimental effects, Plaintiffs must plausibly allege that Defendants' alleged conspiracy "unreasonably restrained competition" in the ***entire market*** for outpatient surgical services. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984); *Ezpeleta v. Sisters of Mercy Health Corp.*, 621 F. Supp. 1262, 1268 (N.D. Ind. 1985) ("As made clear by the *Jefferson Parish Hospital* decision, the relevant market analysis focuses on the services offered by the hospital to the potential patients and the effect such a[n] [exclusive] contract would have on competition among anesthesiologists practicing in the relevant geographic area. It is a ***mistake*** to focus on the effect of the contract on the individual doctor denied practice privileges.") (emphasis added). Here, Plaintiffs do not allege that Cigna members cannot receive Tri State's

11

services absent in-network referrals, let alone that patients cannot obtain outpatient surgical services elsewhere, including from other ASCs. Accordingly, Plaintiffs have failed to allege detrimental effects on competition.

### D. Plaintiffs Have Failed to Plead an Antitrust Injury.

In its opening brief, Cigna pointed out that Plaintiffs have failed to allege an antitrust injury because Plaintiffs' only substantive allegations about injury describe economic losses to Plaintiffs themselves, which is insufficient. (Mem. at 17 (collecting cases).)[4] Plaintiffs counter with the suggestion that "the crippling or elimination of a competitor are enough," citing only a case outside the Eighth Circuit, *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999). (Opp. at 17-18.) But that case, in fact, shows why Plaintiffs are wrong. In *Full Draw*, plaintiff FDP, an archery trade show promoter, alleged that archery manufacturers and an archery trade association had engaged in a group boycott of its trade show, which was one of only two in the market. 182 F.3d at 748. The boycott of FDP therefore "reduced a competitive market of two producers to a market of one monopolist," and "limit[ed] consumer choice to the other source of output [*i.e.*, the one remaining trade show]." *Id.* at 754-55.[5] Thus, in *Full Draw*, "defendants' anticompetitive practices achieved a complete monopoly in the relevant market, leaving consumers with **no alternative**." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1072 (11th Cir. 2004) (emphasis added) (distinguishing *Full Draw*).

---

[4] *See also Verma v. Jefferson Hosp. Ass'n*, 2007 WL 4468689, at *4 & n.54 (E.D. Ark. Dec. 17, 2007) (no antitrust injury where "Plaintiffs' . . . . alleged anti-trust injuries were injuries to Dr. Verma as a physician, but not anti-trust injuries" and noting with citations that "[t]here are numerous cases brought by health care professionals alleging that defendant(s) violated the antitrust laws by prohibiting plaintiff's practice of their professions; the courts have to a large extent found no violation of anti-trust laws.").

[5] *See also Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, 650 F.3d 1139, 1145 (8th Cir. 2011) (noting that in *Full Draw*, "the Tenth Circuit found that [FDP] had suffered antitrust injury because its competitors acted in concert to achieve a boycott that 'reduced the number of competitors in the market from two to one, thereby decreasing competition and harming consumers'") (citation omitted).

Tri State's alleged injuries are not even remotely close. First, Plaintiffs do not allege that Tri State is one of only two (or even a small number of) providers of outpatient surgical services in the Memphis market.[6] Indeed, it is implausible that Tri State—a provider with "two operating rooms and fourteen physician-partners" (Compl. ¶ 2)—is such a key provider in the Memphis metropolitan market that damaging it could harm competition in the entire market. *See Clear Channel Commc'ns*, 376 F.3d at 1072-73 (noting that "[a]lthough damage to a critical competitor *may* also damage competition in general, [plaintiff] bears the burden of drawing that implication with specific factual allegations," and affirming dismissal where "[plaintiff] has not done so"). Second, unlike plaintiff in *Full Draw*, Plaintiffs do not allege that Defendants' alleged group boycott has actually resulted in Tri State's elimination from the market, and they in fact admit that Tri State continues to see at least some patients in the Memphis metropolitan area. (*See* Compl. ¶¶ 2, 12.) Third, while Plaintiffs allege in conclusory terms that "[c]onsumer choices have been limited" (*id.* ¶ 66), they offer no **facts** to gauge the actual impact of these alleged reductions. This, too, is different from *Full Draw*, where it would have been entirely plausible to conclude that eliminating one of only two competitors—thereby creating a "complete monopoly in the relevant market, leaving consumers with no alternative," *Clear Channel Commc'ns*, 376 F.3d at 1072—would significantly limit consumer choices.

Plaintiffs alternatively attempt to claim antitrust injury by alleging that Defendants' actions caused "a reduction in choices available to consumers, reduction in quality, and an inability to use bargained-for benefits," but this tact fails too. (Opp. at 16.) Plaintiffs offer no facts to support these antitrust buzzwords. As described above, Plaintiffs do not plausibly allege

---

[6] In fact, the report on which Plaintiffs rely in the Complaint to show Methodist's market share states that its competitor Methodist "operates in a **highly competitive market**" and that another "multi-facility system (Baptist Health) hold[s] a steady 33% market share." (Mem. at 18 (emphasis added).) Plainly, there are multiple other competitors in the Memphis outpatient surgery market.

the actual impact of the purported boycott on consumers' choices. Conclusory allegations about "reduction in quality" likewise do not suffice, because Plaintiffs do not allege that patients cannot access services of similar quality elsewhere in the Memphis metropolitan area (including from other ASCs) even if the alleged boycott eliminated Tri State from the market. (*See* Mem. at 19.) And while Plaintiffs allege that members of Cigna plans were purportedly unable to use "bargained-for benefits," Plaintiffs nowhere claim that those members could not still see Tri State on their own accord, or that Cigna would not honor the members' out-of-network benefits if they did so. (*Id.* at 9.)

## II. Plaintiffs Have Not Stated a Claim for Tortious Interference with Business Expectancy Against Cigna.

Plaintiffs do not dispute that, under Arkansas law, a party cannot tortiously interfere with contracts or relationships to which it is a party. (*Compare* Mem. at 20-21 (citing cases) *with* Opp. at 18); *see also Sutton v. Ark. State Univ.*, 2011 WL 3861391, at *4 (E.D. Ark. Sept. 1, 2011) (party cannot be held liable for interfering with its own contract). And Plaintiffs concede that "Cigna . . . ha[s] a relationship with medical providers with whom [Cigna has] agreements," and that "Cigna . . . has a relationship with Cigna's members." (*Id.*) Because Plaintiffs' theory of tortious interference claim would hold Cigna liable for its conduct pursuant to both of these relationships, this claim must fail.

Plaintiffs mistakenly argue otherwise because Cigna is not a party to "Plaintiffs [sic] relationships with their patients and Tri State's relationship with its referring physicians." (*Id.*) This was precisely the argument that a court rejected in *Marion Healthcare LLC v. Southern Illinois Healthcare,* 2013 WL 4510168 (S.D. Ill. Aug. 26, 2013), a very similar case involving the same claim. *Compare id.* at *15 (dismissing tortious interference claim despite plaintiff's assertion that defendant "look[ed] to the wrong relationship" because it was purportedly "not a

14

party to the 'business expectancy' of plaintiff") *with* Opp. at 18 (arguing that Cigna "concentrates on the wrong relationships" because it is "[not] a party" to "Plaintiffs' relationship with their patients and Tri State's relationships with its referring physicians"). Like the defendant in *Marion*, Cigna here was "taking action pursuant to already existing relationships," and therefore cannot be liable for tortious interference based on those same actions. 2013 WL 4510168, at *15; *see also* Mem. at 21 n.7 (citing cases).

Plaintiffs do not address this case at all, and their suggestion that *Baptist Health v. Murphy*, 373 S.W.3d 269 (Ark. 2010) dictates a different result is wrong. (Opp. at 18.) In *Baptist Health*, the defendant-hospital had no contractual relationship with either the physician appellees or their patients and instead suggested that it could not be liable for tortious interference because it had an indirect economic interest in the providers' relationships with their patients, invoking the so-called "stranger doctrine." 373 S.W.3d at 283. Here, however, Cigna has had direct contractual relationships with the key groups related to Plaintiffs' tortious interference claim: Physician Plaintiffs (Compl. ¶¶ 13-14); Cigna's in-network medical providers (*id.*¶ 15); and patients covered by Cigna-administered plans who are the subject of Plaintiffs' business expectancy (*id.*). The stranger doctrine is therefore irrelevant to Plaintiffs' claim.

Finally, Plaintiffs have not satisfied the "improper" element of their tortious interference claim. (Mem. at 21-22.) The allegations supporting this element are entirely derivative of Plaintiffs' Sherman Act claim and fall together with that count. And while Plaintiffs recite seven elements that Arkansas courts consider in determining whether conduct was "improper," they do not argue that the Complaint actually alleges facts to support all (or even most) of these elements. (*See* Opp. at 19.) Instead, Plaintiffs point only to their allegation that Cigna's motive was to advance Methodist's interests and to foreclose competition. (*Id.* at 19-20.) At best, this

addresses only two of seven elements of the "improper" inquiry ("the nature of the actor's conduct" and "the actor's motive," *see Baptist Health*, 373 S.W.3d at 282), and Plaintiffs offer no authority to show that such barebones allegations are enough.

## CONCLUSION

For all of the foregoing reasons and those stated in Cigna's opening brief (Dkt. 46), Counts I and III of the Complaint should be dismissed.

Dated:  October 30, 2014

Joshua B. Simon
Warren Haskel
Ryan D. McEnroe
Dmitriy G. Tishyevich
  (all admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
joshua.simon@kirkland.com
warren.haskel@kirkland.com
ryan.mcenroe@kirkland.com
dmitriy.tishyevich@kirkland.com

Respectfully submitted,

/s/  *Chad W. Pekron*

John E. Tull III (84150)
Chad W. Pekron (2008144)
R. Ryan Younger (2008209)
QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, AR  72201
Telephone:  (501) 379-1700
Facsimile:  (501) 379-1701
jtull@qgtlaw.com
cpekron@qgtlaw.com
ryounger@qgtlaw.com

*Counsel for Defendant Cigna Healthcare of Tennessee, Inc.*

**CERTIFICATE OF SERVICE**

       I hereby certify that on this 30th day of October, 2014, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to all counsel of record.

Scott E. Poynter, Esq.  
William Thomas Crowder, Esq.  
Corey Darnell McGaha, Esq.  
Emerson Poynter LLP  
1301 Scott Street  
Little Rock, AR 72202  

Lea Carol Owen, Esq.  
Baker, Donelson, Bearman,  
 Caldwell & Berkowitz  
211 Commerce Street, Suite 800  
Nashville, TN 37201  

Deborah J. Winegard, Esq.  
Whatley Kallas, LLP  
1068 Virginia Avenue NE  
Atlanta, GA 30306  

John G. Emerson, Jr., Esq.  
Emerson Poynter LLP  
830 Apollo Lane  
Houston, TX 77058  

Joe R. Whatley, Jr., Esq.  
W. Tucker Brown, Esq.  
Whatley Kallas, LLP  
2001 Park Place North, Suite 1000  
Birmingham, AL 35203  

Edith M. Kallas, Esq.  
Whatley Kallas, LLP  
1180 Avenue of the Americas, Suite 2000  
New York, NY 10036  

Leigh M. Chiles, Esq.  
Leo M. Bearman, Jr., Esq.  
Matthew S. Mulqueen, Esq.  
Baker, Donelson, Bearman,  
 Caldwell & Berkowitz  
165 Madison Avenue, Suite 2000  
Memphis, TN 38103  

                                                  /s/ Chad W. Pekron  
                                                  Chad W. Pekron