# EXHIBIT A

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

| | |
|---|---|
| TRI STATE ADVANCED SURGERY CENTER, LLC, GLENN A. CROSBY II, M.D., F.A.C.S., and MICHAEL HOOD, M.D.,<br><br>    Plaintiffs<br><br>v.<br><br>HEALTH CHOICE, LLC, and CIGNA HEALTHCARE OF TENNESSEE, INC.,<br><br>    Defendants | Case No. 3:14-CV-00143-JM |
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY, CIGNA HEALTH AND LIFE INSURANCE COMPANY, and CIGNA HEALTHCARE OF TENNESSEE, INC.,<br><br>    Counterclaim Plaintiffs<br>v.<br><br>SURGICAL CENTER DEVELOPMENT, INC. D/B/A SURGCENTER DEVELOPMENT, and TRI STATE ADVANCED SURGERY CENTER, LLC,<br><br>    Counterclaim Defendants | |

## AMENDED COMPLAINT

1.      Plaintiffs Tri State Advanced Surgery Center, LLC ("Tri State"), Glenn A. Crosby, II, M.D., F.A.C.S., and Michael Hood, M.D. (collectively, "Plaintiffs") bring this action alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; tortious interference with contract; intentional interference with business relationships; and violations of the Tennessee Consumer

Protection Act against Defendants Health Choice, LLC ("Health Choice") and Cigna Healthcare of Tennessee, Inc. ("Cigna") (collectively, "Defendants").

2.      Tri State is a state-of-the-art ambulatory surgery center ("ASC") with two operating rooms and fourteen physician-partners is the only ASC in Marion, Crittenden County, Arkansas. Prior to fall of 2014, Crittenden Regional Hospital offered facilities for both in-patient and out-patient surgical procedures. However, Crittenden was forced to file bankruptcy and to close in the fall of 2014, in part because it was unable to compete. Tri State offers orthopeadic, spine, ENT, sports medicine, and interventional pain surgical procedures and, with the closing of Crittenden Regional Hospital, Tri State is the only facility offering these surgical procedures in Crittenden County.

3.      As an ASC, Tri State is able to offer high quality outpatient surgery services to patients more efficiently and at lower cost than offered to patients in hospitals. Tri State also has certain equipment not readily available at other facilities and allows surgeries to be scheduled more expeditiously than they can be scheduled at hospitals. This greatly increases patient choice and makes Tri State a valuable treatment option not only for residents of Crittenden County, but for residents of the greater Memphis Metropolitan Statistical Area (the "Memphis MSA"), which includes Fayette, Shelby, and Tipton counties in Tennessee; Crittenden County, Arkansas; and, Benton Desoto Marshall Tate and Tunica counties in Mississippi.

4.      Tri State cannot treat patients without a physician referral. For this reason, the conspiracy targeted physicians who provide medically necessary services to patients at Tri State, including Drs. Crosby and Hood (the "Physician Plaintiffs"), among others.

5.      The Physician Plaintiffs each provide medical services to patients in Arkansas and in the Memphis MSA. As part of their practices, the Physician Plaintiffs have utilized Tri State in

order to perform outpatient procedures on their patients in a more convenient, safer, and less expensive environment and in response to patient choice and the medical needs of their patients.

6.      Defendant Health Choice is a joint venture physician-hospital organization ("PHO") between MetroCare Physicians, an Independent Physician Association ("IPA"), and Methodist LeBonheur Healthcare ("Methodist"), the dominant hospital system in the Memphis MSA. As the dominant hospital system, Methodist has market power in the Memphis MSA.

7.      MetroCare is an organization that consists of physicians with one of its main goals being "[t]o promote, cooperate and coordinate with [Methodist] and its affiliates." MetroCare Physicians, Vision Statement and Goals, http://metrocarephysicians.com/who-we-are/vision (last visited April 23, 2014). Among other services, Health Choice contracts with managed care organizations on behalf of the physician-members of MetroCare, including Drs. Crosby and Hood. Health Choice also contracts with managed care organizations on behalf of facilities in the Methodist hospital system. In addition to its hospitals, Methodist operates five outpatient surgical centers that compete with Tri State. In order to have an adequate network to serve their subscribers in the Memphis MSA, health insurers must have Methodist in their network.

8.      As detailed below, data published by the American Medical Association ("AMA") show that Defendant Cigna Healthcare of Tennessee, Inc. ("Cigna") has a 42 percent market share for commercial health insurance products in the Memphis MSA. Cigna, accordingly, has market power in the Memphis MSA.

9.      As described in more detail below, co-conspirators Health Choice and Cigna engaged in a concerted refusal to deal or boycott of the Plaintiffs. This ongoing conspiracy and concerted action against the Plaintiffs was and is designed to prevent Tri State and the physicians

who utilize Tri State from contracting with insurers in the Memphis MSA and to prevent the referral of patients to Tri State in order to direct more referrals to Methodist. In part, the illegal conspiracy consisted of Health Choice and Cigna agreeing that Cigna should terminate the Physician Plaintiffs from Cigna's provider network, and that Cigna should threaten to terminate other physicians unless they agreed to stop referring patients to Tri State. On information and belief, Health Choice made this agreement on behalf of its joint venture partner Methodist and in order to attempt to eliminate competition to Methodist, while Cigna made this agreement in an attempt to obtain better terms in its contract with Health Choice and to keep Methodist in its provider network. The fact that Methodist (and therefore Health Choice) and Cigna have market power in the Memphis MSA made the concerted refusal to deal more effective than it otherwise would have been.

10.     Patients are generally referred to Tri State for surgical treatment by their physicians. By demanding that in-network physicians refer patients solely to in-network facilities – including patients with out-of-network benefits - Cigna and Health Choice are effectively precluding patients from choosing treatment at Tri State, which has had an actual detrimental effect on competition. In a May 1, 2014 letter to the Arkansas Insurance Department regarding Dr. Hood's Any Willing Provider Complaint, Cigna stated that it had "reminded Dr. Hood of his contractual obligation to refer Cigna customers to participating providers except in the case of emergency or otherwise required by law." This has also had the effect of making out-of-network benefits illusory and forcing patients to travel out of state for their medically necessary surgical procedures.

11.     As will be further described below, beyond its illegal agreement with Cigna, Health Choice has taken further action to attempt to drive Tri State out of business and to eliminate it as an effective competitor for Methodist's hospitals and ASCs.

12.     Health Choice's anticompetitive agreements and actions are particularly egregious because Health Choice represents itself as an advocate for physicians, including in its negotiations with managed care organizations such as Cigna.

13.     Health Choice's and Cigna's actions are violations of Section 1 of the Sherman Act, constitute tortious interference with contract and intentional interference with business relationships, and are violations of the Tennessee Consumer Protection Act.

14.     As a direct result of Defendants' actions, the Plaintiffs and the patients they serve have been damaged, and competition in the Memphis MSA has been harmed.

## PARTIES

15.     Plaintiff Tri State is an Arkansas limited liability corporation with its principal place of business in Marion, Arkansas. Tri State is incorporated and operates in Arkansas. Tri State treats patients from Arkansas, Mississippi, and Tennessee, with most of its affiliated surgeons' practices based in Memphis, Tennessee. It has suffered, and in all likelihood will continue to suffer, antitrust injuries as a result of Defendants' anticompetitive activities and agreements in restraint of trade including, but not limited to, decreased utilization and decreased revenues.

16.     Plaintiff Glenn A. Crosby II, M.D., F.A.C.S. is a board-certified neurosurgeon licensed in Tennessee, Arkansas, and Mississippi, who practices medicine with the Crosby Clinic in Memphis, Tennessee, and at Tri State. Dr. Crosby has a B.S. from Rhodes College and an M.S. from Georgetown University. He graduated from the University of Tennessee College of

Medicine in 1989 and trained at the George Washington University Medical Center and at Massachusetts General Hospital with Harvard Medical School. Dr. Crosby is a member of Health Choice's joint venture partner MetroCare, through which, prior to the illegal activities complained of herein, he participated in Cigna's provider network.

17.     Plaintiff Michael Hood, M.D. is a surgeon licensed to practice medicine in Arkansas, specializing in sports medicine and general orthopaedics. Dr. Hood has an undergraduate degree from the University of Memphis. He graduated from the Tennessee Health Science Center in 2006 and trained at the University of Missouri Columbia campus and at the Campbell Clinic. Dr. Hood practices medicine with Delta Orthopaedics & Sports Medicine in West Memphis, Arkansas and at Tri State. Dr. Hood is a member of Health Choice's joint venture partner MetroCare, through which, prior to the illegal activities complained of herein, he participated in Cigna's provider network.

18.     Defendant Cigna is a Tennessee corporation with its principal place of business in Tennessee. During all times involved in this Complaint, Cigna acted as either the "third party administrator" of various employers' healthcare plans or as an insurer of various healthcare insurance policies. As described more fully below, Cigna contracts with its "members" and provides them access to networks of providers. In the service area covered by the Health Choice-Cigna contract, Cigna has not created its own network of physicians, but has instead contracted with Health Choice so that Cigna's members may access the provider network created by Health Choice.

19.     The American Medical Association ("AMA") collects data on health insurance markets across the United States. The data it collects include enrollment numbers in health maintenance organization ("HMO"), preferred provider organization ("PPO"), and point-of-

service ("POS") plans throughout the United States. The AMA also reports data on the combined HMO, PPO, and POS product markets. According to the AMA numbers, Cigna controls 53 percent of the HMO business, and 69 percent of the POS business in the Memphis MSA. Cigna's dominance in the insured HMO and POS product markets allows Cigna to retain control of 42 percent of the combined commercial HMO, PPO, and POS product markets in the Memphis MSA. The next largest insurer in the Memphis MSA is Blue Cross and Blue Shield of Tennessee which holds a 21 percent share of the combined HMO, PPO, and POS product market, just half of what Cigna controls. Cigna has market power in the Memphis MSA.

20.     Defendant Health Choice is a joint venture PHO between MetroCare and Methodist, the dominant hospital system in the Memphis MSA. Health Choice contracts with health insurers to provide networks of physicians, hospitals, and other medical providers. Health Choice also provides managed care contracting services for physicians, hospitals, and other medical providers in the Memphis MSA market. Health Choice's CEO is Mitch Graves, whose official biography on Health Choice's website states that prior to joining Health Choice he served as the President and CEO of Methodist LeBonheur Healthcare's Affiliated Services Division, which included Methodist's five outpatient surgery centers.

21.     Health Choice has an exclusive contract with Cigna pursuant to which any physician seeking to join Cigna's network in certain counties in Tennessee and Mississippi must be a member of Health Choice's joint venture partner MetroCare, and must participate with Cigna through Health Choice. On information and belief, however, the service area encompassed in the Health Choice-Cigna contract does not include Arkansas, where Tri State is located and where Dr. Hood practices medicine. Thus, there is no contractual reason for Cigna to require Arkansas providers to be members of Health Choice in order to join a Cigna provider network.

22.     Methodist operates eight hospitals, as well as numerous other health care centers in west Tennessee and Mississippi, including five outpatient surgery centers that compete directly with Tri State. On its website, Methodist does not list any healthcare facilities in Arkansas. In 2012, Methodist reported having a 40 percent market share in the metropolitan Memphis market: In upgrading Methodist's bond rating in an announcement made on November 13, 2013, Moody's Investors Service stated, "[Methodist] is a $1.5 billion multi-facility (eight hospital) system largely in greater metro-Memphis and a single facility recently opened in Mississippi, holding a growing and leading 40% market share (management provided data as of 2012) in the two county metropolitan Memphis market providing certain unique services … ." Therefore, Methodist has market power in the Memphis MSA. Health insurers offering products in the Memphis MSA market need Methodist in their networks in order to provide adequate provider networks and full arrays of medical services to their subscribers.

23.     Health Choice represents on its website and marketing materials that its managed care contracting services "protect physicians and their practices." http://www.myhealthchoice.com/internetsite/practiceportal/healthchoiceservices/ managedcarecontracting.aspx (last visited April 28, 2014).

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because claims asserted herein are brought under federal statutes and necessarily involve adjudication of one or more federal questions. For Plaintiffs' claims under the Sherman Act, jurisdiction arises under 15 U.S.C. § 22, 28 U.S.C. § 1331, and 28 U.S.C. § 1337. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of this Court and the Defendants have the necessary minimum contacts with Arkansas. Health Choice is licensed to operate in Arkansas and contracts with payors on behalf of some Arkansas providers. Cigna includes Arkansas medical providers in its networks and reimburses those providers pursuant to its contract with Health Choice.

26.     Venue is appropriate in this Court under 15 U.S.C. § 22 because the Defendants transact business in this district and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

**FACTUAL ALLEGATIONS**

27.     In 2011, in order to offer the residents of Marion County and the Memphis MSA an alternative to the hospitals that were then available for surgical procedures, a group of physicians joined together to open Tri State Advanced Surgery Center. The founding physicians of Tri State opened the facility in order to provide patients the choice to receive surgical procedures in a more comfortable and effective setting, with the ability to leave the center in the same day.

28.     Tri State is a modern and efficient ASC, licensed by Arkansas, certified by Medicare, and accredited through the Accreditation Association for Ambulatory Health Care. Tri State offers many benefits to patients. Tri State utilizes state of the art surgical technology, and the treatments performed at Tri State are less likely to result in infection than are similar treatments performed in hospitals. The treatments performed at Tri State are also almost always less expensive than similar procedures performed at hospitals. Patients can schedule procedures at Tri State with more flexibility and can generally schedule them sooner than when scheduling

similar procedures at hospitals, where surgeons must compete with longer, less predictable, and emergency surgery procedures. Procedures performed at Tri State are cancelled or delayed less frequently, and Tri State offers shorter wait times and closer parking. Tri State is also associated with a group of board certified physicians, many of whom are nationally recognized. Because of all these benefits, and for many patients the added benefit of being treated closer to home, many patients prefer to be treated at Tri State.

29.      There are many reasons—medical and otherwise—that patients prefer treatment at Tri State to treatment at a Methodist facility in particular. For example, as described below, at one point in time, no Methodist facility had an RF machine, a device required to perform radio frequency ablations ("RFA"). As a result, at least one physician would treat his patients who required RFA treatments at Tri State because Tri State had an RF machine. Additionally, scheduling procedures at Methodist facilities take much longer than at Tri State. Some patients who are in severe pain, for example, want to receive their treatments as quickly as possible. Physicians can perform those treatments the same day at Tri State, whereas performing those same treatments at a Methodist facility can require a physician to wait until his or her block time at that facility, which can take up to a week.

30.      As a result of these and other factors, Tri State and the Physician Plaintiffs provide an important alternative for their patients, who are consumers of healthcare, which increases consumer welfare.

31.      However, because of these benefits and the increased reception from the public toward ASCs, Health Choice has resorted to the concerted activity and anticompetitive practices alleged in this complaint in order to thwart competition and to attempt to drive Tri State out of business.

32.     If Health Choice is successful in forcing all of its physicians to divert cases from Tri State, a set forth in more detail below, Tri State will be forced to go out of business. Regardless of payor, the cases that would have otherwise been referred to Tri State will be diverted elsewhere, most likely to Methodist-affiliated ASCs and hospitals, reinforcing its market power. Patients will most likely be referred to Methodist facilities because Methodist facilities dominate the Memphis MSA and because there are no other facilities in close proximity to Tri State that perform the surgical procedures done at Tri State

33.     Tri State does not have a participating provider agreement with Cigna, and is thus considered an out-of-network ("OON") provider vis-à-vis Cigna's members. However, many of Cigna's members pay higher insurance premiums specifically so that they may receive services at OON providers like Tri State.

34.     Terminating the Physician Plaintiffs, and threatening others with termination, from Cigna's network has limited the treatment options available to Cigna's patients, particularly those patients located in close proximity to Tri State.

35.     Specifically, terminating the Physician Plaintiffs from Cigna's network has greatly reduced primary care and other physicians' referrals of patients to the Plaintiff physicians because at least some primary care physicians stopped referring all patients to the Physician Plaintiffs. This is because primary care physicians do not know which surgeons are in-network with Cigna or any other insurer and just keep one referral list. Therefore, when primary care physicians learned that they could no longer refer Cigna patients to the Physician Plaintiffs, they took the Physician Plaintiffs off their referral lists and stopped referring all patients to the Physician Plaintiffs, regardless of the patients' insurance coverage.

**Market Definition**

36.     Defining a relevant market is unnecessary where, as here, there is evidence of an actual detrimental effect to competition.

37.     Insofar as the Court requires a defined market for the purpose of analyzing Plaintiffs' claims, the relevant product market for the claims in this complaint is the market for the purchase of surgical services or procedures including facility services which do not require hospitalization, including orthopaedic surgery, sports medicine, spinal surgery, otolaryngology, and interventional pain management. Methodist operates five ASCs in Memphis, Tennessee, and Germantown, Tennessee, a suburb of Memphis. Methodist's ASCs compete directly with Tri State in the relevant geographic market as defined below. Moreover, Methodist competes directly with Tri State by offering outpatient surgeries at the operating rooms in Methodist's network of hospitals.

38.     Alternatively, the relevant product market is the market for the purchase of surgical services or procedures including facility services which do not require hospitalization, including orthopaedic surgery, sports medicine, spinal surgery, otolaryngology, and interventional pain management by commercial health plans or insurers.

39.     With regard to the alternative product market, government insurance programs such as Medicare and Medicaid would not be included in the relevant product market because such programs are not interchangeable alternatives for commercial health plans as purchasers of surgical services or procedures which do not require hospitalization or as purchasers of physician services. Medicare is limited to the elderly and disabled. Patients cannot freely move from commercial insurers to Medicare. Accordingly, the Medicare population is fixed and healthcare providers as a whole cannot increase patient workload by switching from commercially insured

patients to Medicare patients. The same is true for Medicaid. Moreover, Medicare and Medicaid do not provide viable alternatives because they pay significantly lower rates and, in fact, often pay cost of below-cost prices. As the Department of Justice has recognized, "[m]any physicians use their commercial health insurance business to compensate for the lower revenue earned from Medicare and Medicaid business." Complaint at 41, *United States v. UnitedHealth Group, Inc.,* No. 1:05-cv-02436-RMU (D.D.C. Dec. 20, 2005), *available at* http://www.justice.gov/atr/cases/f213800/213815.htm. As the Court in *Methodist Hospital Services Corp. v. OSF Healthcare Sys.*, No. 1:13-cv-01054-SLDJEH, 2015 WL 1399229 (C.D. Ill. Mar. 25, 2015) recently recognized, allegations "that access to privately-insured patients is critical to a healthcare provider's long-term sustainability in light of the comparatively low prices providers are required to charge patients covered by government plans for the same services" distinguishes the Eighth Circuit's opinion in *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009). *Id.* at *4-7. Access to privately-insured patients, such as those in plans administered or insured by Cigna, is critical to Plaintiffs' long-term sustainability. Accordingly, Medicare and Medicaid do not provide interchangeable alternatives for commercial insurers.

40.     Because Methodist has the dominant hospital system in the Memphis MSA, the provider networks of health insurers offering products in the relevant geographic market must include Methodist and its ASCs. As a result, Methodist has significant market power in the market for the purchase of surgical services or procedures including facility services which do not require hospitalization, including orthopaedic surgery, sports medicine, spinal surgery, otolaryngology, and interventional pain management, regardless of payor, that Methodist and

Health Choice, on behalf of Methodist, can exercise in dealing with health plan administrators and/or insurers such as Cigna.

41.    Cigna also has market power in the market for administrative services in health benefits plans. Because of its market power in the market for administrative services, Cigna accordingly has market power in the market for the purchase of healthcare providers' services and facilities.

42.    These two entities, Methodist (through its agent Health Choice) and Cigna, have agreed to take action against Plaintiffs in an attempt to drive Tri State out of business. If allowed to continue, Health Choice's conspiracies with insurers and health plan administrators make all types of patients, including Cigna patients, more likely to go to Methodist facilities and increase Methodist's market power.

43.    Driving Tri State out of business would restrict the number of patient options for not only Cigna patients, but also for other commercial health plans and government payors. This is particularly so in light of the bankruptcy and closure of the only hospital in Crittenden County – Crittenden Regional Hospital – in the fall of 2014.

44.    The relevant geographic market is the Memphis, Tennessee Metropolitan Statistical Area (the "Memphis MSA"). The Memphis MSA includes portions of Tennessee, Arkansas, and Mississippi. It includes Fayette, Shelby, and Tipton counties in Tennessee; Crittenden County, Arkansas; and, Benton Desoto Marshall Tate and Tunica counties in Mississippi. Plaintiff Tri State is based in Crittenden County, Arkansas, and the overwhelming majority of its patients come from the Memphis MSA.

45.    There are significant barriers to entry for the relevant markets because establishing a health care facility like Tri State requires substantial investment and expertise.

There are also significant barriers to entry for hospitals and ASCs including state and federal regulations such as certificate of need requirements. Additional barriers to entry are Defendants' and Methodist's illegal activities preventing providers from entering the market.

## Interstate Commerce

46.     Defendants' activities that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

47.     Communications between each Defendant's officers and employees often occurred through interstate communications.

## Defendants' Anticompetitive Conduct and Interference with Contract

48.     Methodist has a history of taking measures and threatening to conspire with health insurers to eliminate competition in order to maintain its dominance in the Memphis MSA market. Approximately ten years ago, several physicians, including a current physician partner of Tri State, applied for the required certificate of need ("CON") to open a new ASC in Memphis. The night before the Health Services Development Agency meeting at which the CON application was to be discussed, the applying physicians were visited by two senior-level Methodist executives who told the physicians: 1) that unless Methodist was granted a 51 percent ownership interest in the proposed ASC, Methodist would fight the opening of the center; 2) that it would cost at least $1 million to take the ASC application through the CON Agency and appeals process; and, 3) that Methodist was "as one" with insurers in the area, so that even if the ASC were ever able to open, it would receive the lowest possible fee schedules from third party payors. As a direct result of these threats, the physicians backed out of the project and the CON application was withdrawn.

49.     At a board meeting of the Methodist Germantown Surgery Center held in the third quarter of 2012, before Tri State commenced operations, the Board Chair raised the topic of Tri State. Health Choice CEO Mitch Graves stated that Tri State would never succeed, and that all of Tri State's investors would "lose their necks." Mr. Graves further recommended that all parties present should encourage others to boycott investments in Tri State.

50.     Based on its previous success in eliminating potential competitors, Methodist knew that the major insurers' agreement would be necessary for Methodist and Health Choice to effectuate the goal of eliminating or minimizing Methodist's competitor Tri State.

51.     Health Choice has entered into exclusive contracts with health insurers, including Cigna, pursuant to which physicians, such as the Physician Plaintiffs, who want to join Cigna's provider network to serve their Cigna patients must do so through Health Choice.

52.     Under the agreement between Health Choice and Cigna, Health Choice and Cigna mutually decide which Health Choice providers should be included in Cigna's provider network. That is, in the service area as defined in their agreement, Cigna has agreed with Health Choice to only contract with those providers who Health Choice has approved and who have contracted with Health Choice or Health Choice's joint venture partner, MetroCare. This arrangement gives Health Choice and, by virtue of its control over Health Choice, Methodist, great power in selecting which providers will be part of Cigna's networks.

53.     On information and belief, the service area covered by the Health Choice-Cigna contract includes specific counties in Tennessee and Mississippi, but does not include any counties in Arkansas. On information and belief, in some instances, Cigna and Health Choice operate as if the Arkansas portion of the Memphis MSA, and Crittenden County in particular, is

part of that service area. That Cigna and Health Choice contracted with Dr. Hood in the first place evidences this.

54.    Prior to the illegal activities complained of herein, the Physician Plaintiffs participated in Cigna's network through Health Choice. Even though the Physician Plaintiffs participated in Cigna's network, Health Choice refused to provide copies of its contract with Cigna to the Physician Plaintiffs until threatened with litigation.

55.    By identical letters dated June 27, 2013, Cigna notified the Physician Plaintiffs, as well as other physicians who treated patients at Tri State, that they had "been engaging in a pattern and practice of consistent and repeated referrals of Cigna patients to Tri-State Advanced Surgery Center, which is a non-network facility that does not participate with Cigna." The letter demanded that they attest that they would "refer Cigna patients to in-network facilities" as allegedly required by the participating provider agreement. Even though these physicians did not have a copy of the agreement, the contents of which they were supposed to attest to, Cigna gave them only 18 days to respond. Otherwise, the letters continued, "Cigna will have to evaluate whether your continued participation with Cigna is in our mutual benefit."

56.    The identical June 27, 2013 letters were inaccurate with respect to the Physician Plaintiffs and other physicians. For example, all of the letters required the physicians to attest to the "terms of the Alan Kraus, MD Cigna agreement," even though neither of the Physician Plaintiffs practiced medicine with Dr. Kraus.

57.    The June 27, 2013 letters were also inaccurate insofar as they asserted that "Cigna's network includes a number of licensed, credentialed and conveniently located outpatient surgery centers in the greater Memphis area." On information and belief, Cigna's network did not include a "number" of outpatient surgery centers in Crittenden County, Arkansas

as of the date of the letter. On information and belief, Cigna does not currently have any in-network ambulatory surgery centers in Crittenden County, Arkansas offering the orthopaedic, sports, spine, otolaryngolic or interventional pain services offered at Tri State. Rather, the only in-network facility offering outpatient surgery in the county is an ophthalmologist's office.

58.     The June 27, 2013 letter was also inaccurate with respect to Dr. Hood in claiming that he had engaged in "a pattern and practice of consistent and repeated referrals of Cigna patients to Tri State" because as of the date of the letter he had only referred two patients to Tri State, both of whom had out-of-network benefits. One of those patients required urgent treatment and Dr. Hood was able to schedule her surgery sooner than at the (now closed) hospital. From June 27, 2013 to date, Dr. Hood has only referred seven patients to Tri State, all of whom had out-of-network benefits and all of whom were informed that Tri State was an out-of-network facility.

59.     Because Health Choice's contract with Cigna is an exclusive contract, a mandate that physicians refer all patients regardless of their medical condition or personal choice to in-network facilities would require the referral of the vast majority of patients to Methodist facilities, even though the Health Choice-Cigna contract does not encompass Arkansas and Methodist does not have any facilities in Arkansas. This is a particular problem for Cigna's patients in Crittenden County, Arkansas because Cigna does not have any in-network ambulatory surgery centers in Crittenden County offering the services offered at Tri State. For Crittenden County residents, a mandate that physicians refer all patients regardless of their medical condition or personal choice to in-network facilities requires their referral out of state.

60.     On information and belief, Health Choice's contract with Cigna does not strictly require referrals of all patients to in-network facilities.

61.     On information and belief, all of the Cigna patients referred by the Plaintiff Physicians to Tri State had out-of-network benefits and were informed that Tri State was an out-of-network provider.

62.     On information and belief, Health Choice and Cigna agreed that Cigna would send the letters threatening termination to physicians treating patients at Tri State in order to coerce these physicians into directing the vast majority of these patients to Methodist-affiliated facilities and away from Tri State.

63.     Although Crittenden Regional Hospital had a direct contract with Cigna, the hospital closed and declared bankruptcy in the fall of 2014. Thus, there are no in-network options for Cigna patients in Crittenden County, Arkansas. Tri State offers Cigna's Arkansas patients the opportunity to be treated closer to home and to take advantage of all the benefits ASCs offer.

64.     Nevertheless, most of the physicians receiving the June 27, 2013 letters felt forced to sign the attestation and to stop referring patients to Tri State due to Health Choice's market power and the significant number of Cigna patients in their practices. The Physician Plaintiffs refused to sign the attestation.

65.     Pursuant to Cigna's agreement with Health Choice, by letter dated October 2, 2013, Cigna gave formal notification to Health Choice's Chief Executive Officer, Mitch Graves, that it was terminating the Physician Plaintiffs and other physicians from its network effective December 1, 2013. Although the letter stated that Cigna was invoking the without-cause termination provision of the contract between Health Choice and Cigna, which permitted termination on 60 days' notice, on information and belief, the Physician Plaintiffs were terminated for refusing to sign the attestation and to stop using their medical judgment to refer

patients to Tri State. Neither Cigna nor Health Choice provided formal notice of the terminations to the Physician Plaintiffs.

66.     That the actual reason Drs. Crosby and Hood were terminated from Cigna's network was their referral of patients to Tri State was confirmed by a January 13, 2014 letter from Lynn M. Field, Methodist's Vice President of Legal Services & Compliance, to undersigned counsel, which stated: "We certainly want Drs. Crosby and Hood reinstated, but exactly what should Health Choice be appealing on behalf of your clients? I am not certain why you find the attestation letter sent by Cigna to your clients so objectionable. Many managed care agreements require referral to participating providers … ." Although the letter was sent on Methodist letterhead, Ms. Field later confirmed that she also represents Health Choice, but not MetroCare.

67.     That the actual reason for Dr. Hood's termination was his referral of patients to Tri State was confirmed by Cigna's May 1, 2014 letter to the Arkansas Insurance Department which stated, "Dr. Hood refused to sign the attestation. Consequently, on October 2, 2013, Cigna notified Health Choice of its decision to terminate Dr. Hood from the network effective December 1, 2013."

68.     Both Physician Plaintiffs learned that they had been terminated from Cigna's provider network through their patients—neither Physician Plaintiff received a termination letter from Cigna or Health Choice. Rather, the Physician Plaintiffs' patients started receiving letters from Cigna, which stated that the Physician Plaintiffs would no longer be part of Cigna's provider network effective December 1, 2013.

69.     Between October 12, 2013 and October 25, 2013, at least fifteen patients contacted Dr. Hood to express their shock and frustration that he would no longer be part of

Cigna's provider networks. Dr. Crosby received a similar number of complaints regarding his termination.

70.     To date, neither Dr. Hood nor Dr. Crosby has received official notification from Cigna regarding the termination decisions.

71.     On November 4, 2013, a Cigna representative called Dr. Hood's office manager and informed her that Health Choice had sent a letter to Cigna requesting that Cigna terminate Dr. Hood, and that Cigna agreed to do so. Thus, Cigna had entered into an agreement with Health Choice to terminate Dr. Hood from its network.

72.     Dr. Hood later contacted Cigna in an effort to contract with Cigna directly. Although he was originally informed that he could contract directly with Cigna, he was later advised that he could only contract with Cigna through Health Choice.

73.     Dr. Crosby was likewise advised that Health Choice and Cigna had agreed to terminate him from Cigna's provider network unless he attested that he would only refer patients to in-network facilities.

74.     On October 9, 2013, Health Choice's Mitch Graves sent Dr. Crosby an e-mail asking to meet with Dr. Crosby to discuss his "out of network cases being done at the Marion surgery center," an obvious reference to Tri State.

75.     Drs. Crosby and Hood were not the only physicians who were sent the June 27, 2013 letter from Cigna demanding that they sign the misleading attestation or face termination from the network. One such physician, who did not actually receive the letter since it was sent to an old address, was informed by a Cigna representative on October 21, 2013, and by another Cigna representative approximately a week later, that Health Choice had requested Cigna to terminate him from its provider panel and Cigna had agreed to do so if he did not sign the

attestation. In an October 22, 2013 conference call with Chuck Utterback of Cigna and Mitch Graves of Health Choice, the physician told them that he referred patients to Tri State for medical reasons. Specifically, he referred patients requiring RFAs to Tri State because Tri State had an RF machine and Methodist facilities did not. He also referred patients with severe pain needing immediate nerve blocks to Tri State because they could be treated sooner at Tri State than at Methodist. Despite these valid medical reasons for patients to prefer treatment at Tri State, and despite the fact that all of these patients had paid premiums for OON benefits, the physician was told he had to refer patients to Methodist. In addition, Cigna's representative Utterback told this physician if he signed the attestation, Cigna would stop the termination process. Because he treats a significant number of Cigna patients and could not afford to lose the revenue from treating these patients, the physician reluctantly caved into the pressure, signed the misleading attestation, and stopped referring Cigna patients to Tri State. The agreement between Cigna and Health Choice had the desired effect of driving all of this physician's business away from Tri State and into the arms of its competitor, Methodist.

76.    In July 2013, the office manager of another physician whom Health Choice and Cigna agreed should be terminated absent a signed attestation and who had received the June 27, 2013 letter, received a call from a Cigna representative. The Cigna representative stated that if the physician did not stop referring patients to Tri State, neither the physician nor his partners would be permitted to perform a new office procedure, balloon sinuplasty, which is performed on sinus patients, even though Cigna had permitted other physicians to perform the procedure in their offices. On information and belief, Health Choice and Cigna agreed to make such calls in a further anti-competitive effort to dry up referrals to Tri State and to stymie any competition from the center. The physician reluctantly signed the attestation. He was not terminated from Cigna's

network. The agreement between Cigna and Health Choice to terminate this physician unless he signed the attestation, however, had the desired effect of driving all of this physician's business away from Tri State and into the arms of its competitor, Methodist.

77.     That same physician also received letters from Cigna in 2013 demanding that he disclose his financial interest in Tri State to patients. Although he had financial interests in other ASCs, this was the first time that Cigna demanded such disclosures. On information and belief, Cigna sent this letter as part of its agreement with Health Choice to dry up patient referrals to Tri State.

78.     Health Choice has also attempted to reach agreements with other health insurers to threaten termination of physicians referring patients to Tri State in order to dry up referrals and stymie competition from the facility, ultimately eliminating it as a competitor to Methodist. For example, based on an agreement that Health Choice reached with Aetna, on January 25, 2013, Aetna sent letters to several Tri State physician-investors erroneously stating that "our research shows that on several occasions, your Aetna patients received services at a nonparticipating facility, Tri State Advanced Surgery Center." The letter reminded the physicians that "your Physician Agreement requires you to use contracted, participating network providers." These letters were sent, however, *before* Tri State had ever opened its doors for operation, indicating that Aetna had been directed to send the letters. This is apparent because an internal review would have shown no claims submitted for medical services performed at Tri State. Upon information and belief, Aetna sent these letters based on an agreement with Health Choice or Methodist.

79.     After the mistake was brought to its attention, Aetna sent follow-up letters dated the same date which stated, "You recently received a letter from Aetna implying that you were

referring Aetna members to a non-participating Ambulatory Surgery Center – Tri State Advanced Surgery Center. After further research, it was determined that in fact you were not one of the providers identified."

80.     On information and belief, Health Choice also engaged in illegal anticompetitive conduct by agreeing with Blue Cross Blue Shield on measures to stop referrals of patients to Tri State. Tri State has a network participation agreement with Blue Cross Blue Shield of Arkansas, the state in which it is located. Patients with Blue Cross Blue Shield health plans from other states can be treated at Tri State under the Blue Card program, which is a nationwide program specifically developed to allow patients travelling in other states and patients working for out-of-state companies to be treated anywhere they seek medical treatment. Nevertheless, Blue Cross Blue Shield of Tennessee erroneously advised physicians that they could not refer patients to Tri State because it was not contracted with Blue Cross Blue Shield of Tennessee. On information and belief, Health Choice and Blue Cross Blue Shield of Tennessee agreed to provide physicians with this erroneous information in a further effort to dry up referrals to Tri State and to stymie competition from the facility.

81.     Health Choice has engaged in anti-competitive conduct (like its agreements with Cigna, Aetna, and Blue Cross and Blue Shield of Tennessee) to dry up patient referrals to Tri State since Tri State's inception.

82.     As a further example of Health Choice's anti-competitive actions designed to drive Tri State out of business, one of Tri State's physician-investors was informed the afternoon of a Health Choice board meeting that Tri State was being considered for membership at that evening's board meeting. This surprised the physician-investor because Tri State had not yet applied for membership in Health Choice. He attempted to contact Health Choice board

members before the vote but was unsuccessful due to the limited time before the meeting. At the board meeting, despite not having an application before it, Health Choice denied Tri State membership, with all the Methodist appointed board members voting against Tri State and all but one of the physician board members either voting in favor of Tri State or abstaining from the vote.

83.     There is no pro-competitive justification for Health Choice and Cigna's conduct, their agreements in restraint of trade, and their efforts to dry up referrals to Tri State, to prevent Tri State from joining insurer networks, and to drive Tri State out of business.

84.     Consumer welfare and competition have been harmed by Health Choice and Cigna's agreements in restraint of trade. Consumer choices have been limited by Health Choice's and Cigna's actions which have forced physicians to stop referring patients to Tri State. Consumers and competition have also been harmed by Health Choice's and Cigna's actions which have precluded patients from using their OON benefits, for which they have paid additional insurance premiums to receive treatment at the facility of their choice.

85.     Plaintiffs have been damaged as a direct and intended outcome of the unlawful agreements between Health Choice and Cigna.

**<u>Health Choice's Deceptive Trade Practices</u>**

86.     Health Choice's website represents to physicians that it acts in the interests of physicians when contracting with managed care organizations. Specifically, the web site states, "We recognize that physicians want to focus on their patients rather than analyze what might be costly and burdensome administrative contract language. The contract management team does the homework on these issues and applies that knowledge in the contracting process **to protect physicians and their practices**." http://www.myhealthchoice.com (follow "Practice

Community"; then follow "Health Choice Services"; then follow "Managed Care Contracting") (last visited April 2, 2014) (emphasis added).

87.     Elsewhere on its website, in touting its provider advocacy services, Health Choice represents that the "Provider Advocacy department at Health Choice was developed to provide our physician network a resource of service and assistance for all things practice management … The provider Advocacy department is your liaison for contracting." http://www.myhealthchoice.com (follow "Practice Community"; then follow "Health Choice Services"; then follow "Provider Advocacy") (last visited April 2, 2014). The website further represents that Health Choice "**work[s] for our providers** as a unified voice under the Physician-Hospital Organization." *Id.* (emphasis added).

88.     As previously alleged, Health Choice has not worked on behalf of Drs. Crosby or Hood, and has not protected theses physicians and their patients. Rather, in reaching an agreement with Cigna to terminate these physicians unless they signed a misleading attestation requiring referral to in-network facilities, which necessarily meant to Methodist facilities, Health Choice was representing Methodist's interests rather than the physicians'.

89.     That Health Choice was representing Methodist's interests rather than those of the physicians was confirmed by Mitch Graves' conference calls and efforts to meet with the physicians being terminated regarding their referrals to Tri State. Instead of acting as an advocate for the physicians, Mr. Graves acted on behalf of Methodist to attempt to coerce the physicians to sign the misleading attestation and to stop referring patients to Tri State.

90.     That Health Choice was representing Methodist's interests rather than those of the physicians was further confirmed by the letter from Methodist's counsel on Methodist letterhead

asking "what exactly should Health Choice be appealing on behalf of your clients? I am not certain why you find the attestation letter sent by Cigna to your clients so objectionable."

91.     Consequently, Health Choice's representations on its website that it advocates on behalf of physicians when it clearly did not with respect to Drs. Crosby and Hood were unfair and deceptive in violation of Tenn. Code Ann. § 47-18-104(5), which prohibits "representing that goods or services have . . . characteristics, . . . uses, benefits or qualities that they do not have."

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**(Against Cigna and Health Choice)**

92.     Plaintiffs repeat and reiterate each and every prior allegation as if fully set forth at length herein.

93.     Even before Tri State opened for operation, and continuing to the present, Health Choice and Cigna have engaged in an illegal agreement, contract, combination, and conspiracy that has unreasonably restrained trade in the market for the purchase of surgical facility services or procedures which do not require hospitalization and the market for the purchase of surgical facility services or procedures which do not require hospitalization by commercial insurers in the Memphis MSA in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

94.     The agreement between Health Choice – acting on behalf of Methodist – and insurers, including Cigna to dry up referrals to Tri State in an attempt to put Tri State out of business and to direct referrals to Methodist through a variety of anticompetitive means represents an illegal agreement under Section 1 of the Sherman Act.

95.     Health Choice's and Cigna's illegal agreement, contract, combination, and agreement has consisted of an illegal boycott which, among other things, resulted in Cigna refusing to provide Tri State with an in-network contract, and with Cigna terminating the

Physician Plaintiffs from Health Choice's provider agreement with Cigna. Upon information and belief, the unlawful agreement between Health Choice and Cigna was effectuated through Health Choice in order to limit competition to Methodist's outpatient surgery centers.

96.     As a direct and proximate result of Health Choice's and Cigna's continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Health Choice's and Cigna's conduct unlawful. For Tri State, these damages consist of lost patient referrals and lost revenues associated with treating these patients. For the Physician Plaintiffs, these damages consist of lost patients, lost revenues associated with treating these patients, and disruption in doctor-patient relationships.

97.     Defendants' conduct was intended to have a detrimental effect on all those patients seeking services in the relevant market by limiting their options and forcing their healthcare provider to treat them at a Methodist-affiliated facility.

98.     Plaintiffs seek treble damages from Defendants for their violations of Section 1 of the Sherman Act, as provided by the Clayton Act, 15 U.S.C. § 15.

99.     Health Choice's and Cigna's unlawful conduct threatens to continue to injure Plaintiffs. Pursuant to 15 U.S.C. § 26, Plaintiffs seek a permanent injunction prohibiting Health Choice from entering into agreements with payors, including Cigna, to terminate contracts with physicians as a result of their referring patients to Tri State, thus entering into agreements to boycott Tri State. Plaintiffs also seek a permanent injunction prohibiting Cigna from terminating physicians' participation in Cigna's network by reason of their referral of patients to Tri State.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT
### (On Behalf of Physician Plaintiffs Against Health Choice)

100.    Plaintiffs repeat and reiterate each and every prior allegation as if fully set forth at length herein.

101.    The Physician Plaintiffs had indirect contracts with Cigna: Through their contracts with MetroCare, the Physician Plaintiffs treated Cigna members under the terms of the agreement between Cigna and Health Choice. In exchange for those services, Cigna reimbursed the Physician Plaintiffs. Health Choice was aware of the contractual relationships between the physician plaintiffs and Cigna. Health Choice's illegal activities have resulted in Cigna removing the Physician Plaintiffs from Cigna's provider network.

102.    Health Choice intentionally interfered with the contractual relationships between the Physician Plaintiffs and Cigna. The statements made by Mitch Graves and other members of Health Choice's board indicate that Health Choice would not allow any provider in the Memphis MSA to utilize health care facilities that were not controlled by Methodist. As direct evidence of this intentional interference, when one Tri State physician contacted Cigna to inquire about his termination, the Cigna representative stated that Health Choice played a role in the decision.

103.    Moreover, Health Choice's interference was improper. The statements by Mitch Graves and the other Health Choice board members indicate that Health Choice made these decisions with malice and with the intent to force the Physician Plaintiffs to refer all patients to Methodist facilities in an effort to stymie competition from Tri State.

104.    As a direct result of Health Choice's actions, the Physician Plaintiffs have been terminated from Cigna's provider network and have lost patients, revenue, and good will in the Memphis MSA.

105.     Plaintiffs seek compensatory and punitive damages from Health Choice for its tortious interference with their contracts.

## COUNT III
### TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY
#### (Against Cigna and Health Choice)

106.     Plaintiffs repeat and reiterate each and every prior allegation as if fully set forth at length herein.

107.     Plaintiffs had valid business expectancies in the form of future relationships with many patients with Cigna insurance in the Memphis MSA, especially those patients who need outpatient surgical services. Moreover, these business expectancies would have become actual business relationships because Plaintiff Tri State offers outpatient surgery treatments at lower costs and at more efficient facilities than available in hospital settings.

108.     Defendants were aware of these business expectancies because the potential patients are those who have health benefit plans through Cigna.

109.     Defendants intentionally interfered with these relationships via improper means: as described more fully above, Health Choice and Cigna conspired to terminate the Physician Plaintiffs from Cigna's network, and Health Choice used its influence in an effort to prevent Tri State from opening and operating successfully. Moreover, Defendants interfered with these business expectancies to eliminate competition in the health care market in the Memphis MSA by, *inter alia*, engaging in activities in order to run Tri State out of business.

110.     Defendants' actions have resulted in substantial economic harm to Plaintiffs, including the loss of patients and revenues associated with treating these patients. Moreover, Defendants' actions have permanently damaged the good will of Plaintiffs in the Memphis MSA.

## COUNT IV
## DECEPTIVE TRADE PRACTICES IN VIOLATION OF
## TENN. CODE ANN. § 47-18-104
### (Against Health Choice)

111.    Plaintiffs repeat and reiterate each and every prior allegation as if fully set forth at length herein.

112.    Health Choice advertises itself as a representative and advocate of providers in the Memphis MSA.

113.    Physician Plaintiffs joined MetroCare, and through it, Health Choice, in order to receive the benefits of having Health Choice serve as their advocate in negotiating with health plans, including Cigna. In light of Health Choice's actions, which have resulted in the termination of Physician Plaintiffs from Cigna's network, Health Choice's representations that advocates on behalf of physicians with health plans is clearly false.

114.    Health Choice's actions are in violation of Tenn. Code Ann. § 47-18-104(b)(5).

115.    Plaintiffs seek compensatory and treble damages from Health Choice for its tortious interference.

## PRAYER FOR RELIEF

116.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against the Defendants and provide the following relief:

a.    A judgment declaring that Defendants have violated Section 1 of the Sherman Act;

b.    A judgment declaring that Health Choice tortuously interfered with the Physician Plaintiffs' indirect contracts with Cigna in violation of Arkansas law;

c.      A judgment declaring that Defendants intentionally interfered with Plaintiffs' business expectancies with patients and potential patients in violation of Arkansas law;

d.      A judgment declaring that Health Choice engaged in deceptive trade practices in violation of Tenn. Code Ann. § 47-18-104(b)(5);

e.      Three times the amount of damages suffered by Plaintiffs as proven at trial;

f.      Punitive damages;

g.      Interest on all such amounts;

h.      A permanent injunction prohibiting Health Choice from entering into agreements with payors, including Cigna, to terminate contracts with physicians as a result of their referring patients to Tri State, thus entering into agreements to boycott Tri State;

i.      A permanent injunction prohibiting Cigna from terminating physicians' participation in Cigna's network by reason of their referral of patients to Tri State;

j.      Attorney's fees, collection costs, and all other fees, costs and disbursements incurred in connection with this lawsuit; and

k.      Such other and further relief, at law and equity, as the Court deems just, proper, and appropriate.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial for all claims so triable.

32

Dated: May 15, 2015

Respectfully submitted,


*/s/ W. Tucker Brown*
Joe R. Whatley Jr.
W. Tucker Brown
Whatley Kallas, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Phone: (205) 488-1200
Fax: (800) 922-4851
E-mail: jwhatley@whatleykallas.com
            tbrown@whatleykallas.com

Edith M. Kallas
Whatley Kallas, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
Phone: (212) 447-7060
Fax: (800) 922-4851
E-mail: ekallas@whatleykallas.com

Deborah J. Winegard
Whatley Kallas, LLP
1068 Virginia Avenue NE
Atlanta, GA 30306
Phone: (404) 607-8222
Fax: (404) 220-9625
E-mail: dwinegard@whatleykallas.com

John Emerson
Emerson Poynter LLP
1301 Scott Street
Little Rock, AR 72202
Telephone: (501) 907-2555
Fax: (501) 907-2556
Email: jemerson@emersonpoynter.com